**FACTORY MARKET, INC., Plaintiff,**

v.

**SCHULLER INTERNATIONAL INC., Defendant.**

**No. CIV. A. 97–0435.**

United States District Court,
E.D. Pennsylvania.

Aug. 31, 1997.

As Amended Jan. 9, 1998.

Stephen J. Mathes, Elliot Fertik, Hoyle, Morris & Kerr, Philadelphia, PA, for Factory Market, Inc., Plaintiff.

John L. Aris, Duane, Morris & Heckscher, Philadelphia, PA, for Schuller International, Inc., Defendant.

*MEMORANDUM*

NEWCOMER, District Judge.

Presently before this Court are defendant's Motion for Partial Summary Judgment, and the plaintiff's response thereto. For the reasons that follow, this Court will grant in part and deny in part defendant's Motion.

## I. Background

This action arises out of an ongoing and contentious dispute between the parties over a roofing system which defendant Schuller International, Inc. ("Schuller")[1] designed and constructed over a building in which plaintiff Factory Market, Inc. ("FMI") possesses a leasehold interest. In order to properly understand the current dispute between these parties, the Court must set forth the history behind the parties' instant dispute.

The building at issue in this case was originally leased by The Budd Company ("Budd"). Budd approached United States Roofing Corp. ("USR") and issued a quotation request seeking a new roof with a guarantee that had a duration of at least ten years and was non-prorated. USR contacted Mr. Budd Flynn, the local representative for Schuller. After consulting with USR, Mr. Flynn selected the EDPM system that was eventually used on the roof of the building. USR then incorporated the EDPM system into its proposal, which it submitted to Budd.

The guidelines for receiving a guarantee from Schuller required USR to submit certain documents to Schuller at the time the roofing contract was awarded. Schuller specifically required "a report from the representative of the owner stating that the structure is capable of supporting the completed SPM roofing system." (Manville Roofing Handbook Ex. 6 at SI00008). No such report was ever allegedly issued by Budd, accepted by USR, or forwarded by Schuller. Despite the non-existence of this report,

---

1. Plaintiff claims that Schuller has recently changed its name back to Johns–Manville Corporation. Defendant claims that this contention by plaintiff is simply incorrect. Defendant asserts in its answer that Manville Sales Corporation was a division of Schuller International at the time of the events in question herein. Defendant also notes that Manville Corporation was at the time the parent of Schuller, that no longer being the case.

Schuller issued the guarantee on the roofing system.

During the installation of the EDPM roofing system on the building, USR allegedly became concerned about applying the EDPM membrane directly over the building's tectum deck.[2] Tectum planks are held together with metal clips, and USR became concerned that the clips on the planks could penetrate the EDPM (rubber) membrane that was installed over the deck. Mr. Flynn allegedly assured USR that the installation was proper. USR requested a change in the specification to include a slip sheet; however, Mr. Flynn allegedly stated that no slip sheet was required.[3] However, due to its own concern, and at its own expense, USR installed a slip sheet over a portion of the roof.

Once the installation of the roofing system was complete, Mr. Flynn inspected the roof. Mr. Flynn communicated to USR that Schuller would not issue any guarantees on the roof until additional drainage was added. As per Schuller's request, and consistent with Schuller's own specifications, USR installed the additional drains. After the drains were installed, Schuller issued Manville Signature Series Watertite Roofing System Guarantee ("Guarantee") on the roofing system on the building. Under this guarantee, Schuller agreed to pay for all material and labor necessary to repair the roofing system and maintain it in a watertight condition in the event of leak, defect or failure. In addition, the Guarantee specified that any required repairs could be made only by Schuller-certified roofing contractors upon Schuller's approval, or the guarantee would be void.

From the outset, the roofing system was plagued with leaking problems. For the first two years of the term of the Guarantee, USR had responsibility for making repairs to the roof of the building without cost to the owner or Schuller. During this period, USR's records reflect many different service calls on

the roof of the building. The vast majority of those leaking problems were caused by metal tectum deck clips penetrating the roofing system's rubber membrane, just as USR had predicted when it originally installed the roofing system. Some of these punctures even occurred where USR had installed the slip sheet. Even Schuller's own representatives later agreed that the metal tectum deck clips were the primary cause of the roofing system's problems. Both H. Blum Contracting Corp. ("Blum") and Saling Roofing stated that most of the leaks were caused by penetration of the roofing membrane caused by tectum clips.

FMI assumed the leasehold interest in the building, and consequently desired to have the Guarantee on the roofing system transferred to its name in accordance with Budd's representations to FMI. USR's original proposal to Budd clearly stated that the ten-year Guarantee was transferable at no extra charge. However, when FMI attempted to have the Guarantee transferred to itself, Schuller, seeing a possible opportunity to get out from under its obligations, refused to transfer the Guarantee.

Because of continued leaking and Schuller's refusal to transfer the Guarantee to FMI, FMI initiated a law suit against Schuller in the Superior Court of New Jersey, Union County. *See Factory Market, Inc. v. Manville Sales Corporation and United States Roofing Corporation*, Civil Action No. UNN–L–2582–91. FMI and Schuller eventually negotiated a settlement of this law suit. As part of the Settlement Agreement, it was agreed that Blum, one of Schuller's designated and approved roofing contractors, would conduct repairs on the building pursuant to a repair proposal that he had submitted to Schuller, at Schuller's request, over eight months before the Settlement Agreement was signed. In addition to these repairs, Schuller agreed to extend the expi-

---

2. In roofing terminology, a "deck" consists of the structural element of the building over which the roofing system is placed. The deck at 375 Commerce Drive was made out of tectum, which consists of two foot by four foot planks of concrete-impregnated wood fibre material which has been manufactured to be fire-retardant, and which in this location was placed on a steel bar-

joist truss system with vertically protruding metal clips used to maintain alignment and fastening of the planks.

3. A slip sheet is a protective layer placed between a roofing membrane and a building's deck.

ration date on the Guarantee for certain portions of the roof. In this regard, Schuller issued three new guarantees ("Guarantees"), which each covered a different portion of the roof for different periods of time.

FMI alleges that during the settlement negotiations, Schuller's representatives repeatedly assured FMI that Blum's repairs would render the building watertight and alleviate any need for constant repairs. FMI contends that Schuller's representatives stated that their technical staff had investigated the roof of the building, and Schuller's technical staff was certain that Blum's proposal would render the roof watertight. Indeed, had Schuller not made these representations, FMI states that they would not have signed the Settlement Agreement.

FMI submits that Blum's proposal, as anyone with knowledge of the roofing industry would know, could not and did not render the roofing system watertight. FMI also argues that any person reasonably knowledgeable about the EDPM roofing system installed at 375 Commerce Drive would have known that Blum's proposal could not have rendered and did not render the roofing system watertight.

FMI contends that the inadequacy of Blum's repairs is demonstrated by the roof's continuing leaking even after the Settlement Agreement was signed and the repairs had been performed. In the three years between the signing of the Settlement Agreement and Schuller's decision in 1996 not to service the roof, FMI and/or its tenants reported dozens of leaks to Schuller, and Schuller's designated and approved roofing contractors visited the building on dozens of occasions. Although space limitations prevent a full description of each leak and Schuller's response thereto, the Court sets forth the following examples to highlight the problems that FMI was having with the roofing system on the building.

The first leak in the newly replaced roofing area occurred less than three weeks after Blum completed the repairs required by the Settlement Agreement. FMI reported leaks

to Schuller on September 8, 1993, and subsequently followed up this report with a letter dated September 21, 1993. A meeting was held on October 14, 1993, at which Schuller allegedly agreed that its designated roofing contractor, Blum, would conduct certain additional repairs, which are the same repairs that were supposedly addressed in Blum's original proposal which was incorporated into the Settlement Agreement.

Through the following months of November and December, Schuller did not complete the repairs as agreed between the parties at the October 14, 1993 meeting. FMI contacted Schuller on November 2 and December 1 and 6, 1993 to inquire into the status of the repairs and to report additional leaks. On December 15, 1993, Schuller sent a new roofing contractor, Saling Roofing, to repair the roof.

A log, kept by Saling Roofing, shows that Saling visited FMI's building on repair calls no less than 17 times in just over a year and a half, from November 1994 to July 1996.[4] A note produced by Schuller states that in December 1995 Schuller told its designated roofing contractor, Saling Roofing, not to service the roof of the building unless water was removed. Schuller, however, allegedly did not inform FMI that Saling would not service the roof unless the water was removed.

FMI contends that by 1996, Schuller's response had become so inadequate that Schuller's Guarantee Services Unit, in block letters, told Schuller' local representatives to "DO SOMETHING." FMI alleges that Schuller, despite the request from its Guarantee Services Unit, chose to do nothing. Indeed, FMI contends that Saling Roofing informed it that Saling Roofing could no longer repair the roof of the building at 375 Commerce Drive. Apparently, Schuller did not inform FMI of this fact directly.

Because of Schuller's alleged lack of responsiveness, FMI hired its own roofer to conduct repairs over the Little Explorers

---

4. During the time that Saling Roofing serviced the building at 375 Commerce Drive, the building had four tenants: Vie de France Bakery, Little Explorers Day Care Center, Jelyn/Old Glo- ry, and Rainbow the Copy Factory. Thus, the entries in Saling's log refer to the tenants, not FMI itself.

Day Care Center because the leaks were endangering the children. After FMI's own roofer conducted these repairs, FMI sent a letter dated October 11, 1996 to Schuller, requesting that Schuller present a plan to repair or replace the roofing system. On November 14, 1996, Schuller responded to FMI's letter. In this letter, Schuller asserted that it fully intended to honor its obligations under the Guarantee, but that FMI must first rectify certain conditions (the ponding of water and release of a foreign substance on the roof by one of FMI's tenants which was allegedly attacking the membrane of the roofing system) on the roof which were preventing the repairs of Schuller from correcting the leaks.

FMI responded to this letter from Schuller by filing suit in the Court of Common Pleas of Philadelphia County, Pennsylvania. This action was then removed to this Court on January 21, 1997 by plaintiff.

In the complaint, plaintiff alleges four causes of action against defendants: (1) breach of contract—the Settlement Agreement; (2) breach of contract—the Guarantee; (3) negligence; and (4) fraud. In addition to these claims, plaintiff sets forth six alternative causes of action: (1) breach of contract; (2) breach of explicit warranty; (3) breach of implied warranty; (4) negligent design, (5) breach of warranty for a particular purpose; and (6) strict liability. These alternative causes of action were initially brought by FMI against Schuller in the 1993 state action. FMI argues that it is entitled to reinstate these claims against Schuller because of Schuller's breach and repudiation of the Settlement Agreement.

Schuller presently moves for partial summary judgment against FMI. In its motion, Schuller argues that FMI's negligence claim in Count III should be dismissed because (1) this claim is properly a breach of contract claim, (2) the economic-loss doctrine bars recovery in tort, and (3) the statute of limitations bars FMI's negligence claim. Schuller also argues that summary judgment should be entered in its favor on Count I because it did not breach the Settlement Agreement. Schuller further contends that summary judgment should be entered in its favor on

Count IV, plaintiff's fraud count, because (1) plaintiff has failed to state a claim for fraud, (2) the fraud claim is barred by the statute of limitations, and (3) plaintiff has failed to plead its fraud claim with sufficient specificity.

Schuller also contends that this Court should dismiss plaintiff's Alternative Counts because these causes of action should be pursued in the court in which the Settlement Agreement was reached. If the Court does not dismiss plaintiff's Alternative Counts, Schuller asks the Court to enter summary judgment in its favor on Alternative Counts III and IV because these implied warranty claims are barred by the terms of the Guarantees. Schuller also argues that plaintiff's claim for punitive damages must be dismissed because such damages are not available in a breach of contract case, and that plaintiff's claim for consequential damages are barred by the terms of the Guarantees. Finally, Schuller argues that summary judgment should be entered in its favor on Alternative Counts IV and VI because these claims, sounding in negligent design and strict liability, are also barred by the economic-loss doctrine. In response, plaintiff generally argues that all of defendant's arguments are without merit. The Court will address the issues raised *seriatim.*

## II. Summary Judgment Standard

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988). "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The evidence presented must be viewed in the light most favorable to the non-moving party. *Id.* at 59.

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317,

324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Moreover, when the non-moving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2551).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White,* 862 F.2d at 59 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2551). The non-movant must specifically identify evidence of record, as opposed to general averments, which supports his claim and upon which a reasonable jury could base a verdict in his favor. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2551. The non-movant cannot avoid summary judgment by substituting "conclusory allegations of the complaint ... with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). The motion must be denied only when "facts specifically averred by [the non-movant]" contradict "facts specifically averred by the movant." *Id.*

### III. Discussion

As an initial matter, this Court notes that the laws of the Commonwealth of Pennsylvania will govern this instant action. This case is before this Court pursuant to its diversity of citizenship jurisdiction. 28 U.S.C. § 1332(a). The parties have relied principally on Pennsylvania law in their pleadings.

To the extent that the law of a state other than Pennsylvania could control the resolution of these motions, the Court concludes that issue has been waived by the parties, *see Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1005 n. 1 (3d Cir.1980), and that Pennsylvania law shall apply.

### A. Can Plaintiff Proceed under Tort or Contract Law?

Defendant's first argument centers around the issue of whether plaintiff can assert both a tort claim for negligence and a breach of contract claim. In its memorandum of law in support of its motion, defendant argues that because the " 'gist' of [plaintiff's negligence] claim is a breach of the Settlement Agreement sounding only in breach of contract, not in tort," plaintiff's negligence claim should be dismissed.

In response, plaintiff argues that its negligence claim should not be dismissed. Plaintiff maintains that its negligence claim is based on Schuller's negligent supervision, selection, and inspection of Blum's work, and on the negligent repair work done by Schuller's agents, including Blum. Plaintiff claims that the gist of this claim is on the negligent conduct of Schuller and that the Settlement Agreement is collateral to this count of the Complaint because Schuller's actions were not directly required by the Settlement Agreement. As such, plaintiff contends that it can maintain its negligence claim.

To begin, the Court notes that the Pennsylvania Supreme Court has not as of yet adopted a test to be used in determining whether causes of action sound in contract or in tort. As a federal court sitting in diversity, this Court must predict what the Pennsylvania Supreme Court would do. In making this determination, the Court gives proper regard to the opinions of Pennsylvania's intermediate courts. *See City of Erie v. Guaranty National Ins. Co.,* 109 F.3d 156, 159 (3d Cir.1997).

Turning to Pennsylvania's intermediate courts for guidance, the Court finds that Pennsylvania's law with respect to this issue is very murky. Indeed, the Pennsylvania Commonwealth Court has recently opined that this area of Pennsylvania law is con-

fused. *Grode v. Mutual Fire, Marine and Inland Insurance Co.,* 154 Pa. Cmwlth. 366, 623 A.2d 933, 934 (1993). After examining the law with respect to this issue, this Court certainly concurs with the *Grode* court's assessment. Despite being presented with a confused state of law, this Court must attempt to apply this law to the facts of this case.

A recent decision by the Superior Court of Pennsylvania has significantly clarified this confused state of law. *See Redev. Auth. of Cambria v. Intern. Ins.,* 454 Pa.Super. 374, 685 A.2d 581 (1996). However, before the effect of the *Cambria* decision is discussed herein, the Court must summarize the state of the law prior to this decision in order to put this discussion in its proper context.

In *Grode,* the Commonwealth Court of Pennsylvania summarized an extensive decision of the District Court of New Jersey, in which that federal district court set forth a cogent and admirable explanation of the state of Pennsylvania law on this question. *Grode,* 623 A.2d at 934 (citing *Public Service Enterprise Group, Inc. v. Philadelphia Electric Co.,* 722 F.Supp. 184 (D.N.J.1989)). In the *Public Service* case, defendant, operating owner of a nuclear power plant, moved to dismiss a claim brought by certain co-owners which was grounded in breach of contract and tort in regard to a shut-down of the plant by the Nuclear Regulatory Commission. The *Public Service* court first noted that Pennsylvania law is hostile to recovery of economic losses in tort, at least with respect to parties not in contractual privity. *Id.* at 193–94.

Using this maxim of law as a spring board, the *Public Service* court next noted the United States Supreme Court decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), which held that when a party in privity of contract with another suffers an injury to a product itself, resulting in a purely economic loss, there is no product liability cause of action. *Public Service,* 722 F.Supp. at 195. In noting this decision, the *Public Service* court explained that the Third Circuit has predicted that the Supreme Court of Pennsylvania would adopt *East Riv-*

er as the law of Pennsylvania. *Id.* at 195 (citing *Aloe Coal Co. v. Clark Equip.,* 816 F.2d 110 (3d Cir.1987)). In addition, the Superior Court of Pennsylvania has applied the *East River* rule in a manufactured product case. *See REM Coal Co. v. Clark Equip. Co.,* 386 Pa.Super. 401, 563 A.2d 128 (1989).

The *Public Service* court next pointed to what appeared to be an extension under Pennsylvania Law of *East River* beyond the manufactured goods cases, to professional services cases, in *PPG Indus., Inc. v. Sundstrand Corp.,* 681 F.Supp. 287 (W.D.Pa. 1988). The *Public Service* court, however, distinguished *PPG* as most plausibly read as a products, rather than services case, and found that no Pennsylvania Supreme Court, had as yet even discussed the United States Supreme Court's *East River* decision. *Id.* at 211–12. In addition, the *Public Service* court stated that it was reluctant, in the case before it, to extend *East River's* mode of analysis to a contract not governed by the Uniform Commercial Code. *Id.* Thus, the court did not opine as to whether *East River* should be applied in the context of a services context dispute.

The *Public Service* court next noted a line of cases in which the Pennsylvania courts have held that "a suit between parties to a contract based on negligent breach of contract may be brought in tort only when the plaintiff alleges improper performance of a contract, rather than nonperformance." *Grode,* 623 A.2d at 935 (citing *Hirsch v. Mount Carmel Dist. Ind. Fund Inc.,* 363 Pa.Super. 433, 526 A.2d 422, 423 (1987)); *see also Raab v. Keystone Ins. Co.,* 271 Pa.Super. 185, 412 A.2d 638, 639 (1979). These cases have been titled the misfeasance/nonfeasance cases; in these cases, the courts have determined whether causes of action sound in tort or breach of contract by examining whether the complaint alleges nonperformance of the contract or misperformance of the contract. As this Court will note below, this line of cases no longer seems to be good law in Pennsylvania.

The *Public Service* court next cited several decisions that allowed recovery of economic losses in tort for the negligent provision of services, including *Randall, Inc. v. AFA Pro-*

*tective Systems, Inc.,* 516 F.Supp. 1122 (E.D.Pa.1981) and *Garbish v. Malvern Federal Sav. & Loan Assn.,* 358 Pa.Super. 282, 517 A.2d 547 (1986). In addition, the court noted that many other states also adhere to a distinction between contracts for the sale of goods and those for the provision of services. *Public Service,* 722 F.Supp. at 204.

■ A line of Pennsylvania cases, which were not discussed by the *Public Service* court but are highly relevant for the purposes of the instant dispute, have held that a tort claim may be maintained only when "the wrong ascribed to the defendant ... [is] the gist of the action, the contract being collateral." *Wood & Locker, Inc. v. Doran and Associates,* 708 F.Supp. 684, 689 (W.D.Pa. 1989) (citing *Closed Circuit Corp. v. Jerrold Electronics Corp.,* 426 F.Supp. 361, 364 (E.D.Pa.1977)). The Pennsylvania Superior Court, recognizing that the *Raab* line of cases are inadequate to determine the true character of a claim, has recently determined that for a claim " 'to be construed as a tort action, the wrong ascribed to the defendant must be the gist of the action with the contract being collateral.' " *Redev. Auth. of Cambria,* 685 A.2d at 590 (citing *Phico Ins. Co. v. Presbyterian Medical Services Corp.,* 444 Pa.Super. 221, 663 A.2d 753, 757 (1995)).

In reaching this decision, the Superior Court of Pennsylvania stated that "a contract action may not be converted into a tort action simply by alleging that the conduct was done wantonly." *Phico,* 663 A.2d at 757. In addition, the court explained that "the important difference between contract and tort actions is the latter lie from the breach of duties imposed as matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Id.*

The importance of the *Phico* and *Cambria* cases does not necessarily lie in the court's analysis of the distinction between contract and tort actions, rather the importance of these cases is that the Superior Court of Pennsylvania has signified its disapproval of the misfeasance/nonfeasance cases. Indeed, the *Phico* court explicitly stated that these cases are "inadequate to determine the true character of a claim." *Id.* This Court finds that if the Pennsylvania Supreme Court was faced with this question, it would also adopt the "gist of action" test in lieu of the misfeasance/nonfeasance test.

The Court reaches this conclusion primarily for the reason that although the misfeasance/nonfeasance cases provide a bright line test, "it is not difficult to imagine many agreement-based complaints which may be characterized as sounding in tort when they more properly should be seen as contractual." *Id.* If the misfeasance/nonfeasance rule applied, one of the parties to a contract could defeat the reasonable expectations of the parties, who may have specifically contracted to limit their liability, by bringing suit in tort to recover damages beyond that which was negotiated and agreed upon by the parties. The gist of the action test allows courts to review the actual dispute in question to determine whether, under the facts of that particular case, the claim should sound in tort or contract. Under this test, a party cannot disrupt the expectations of the parties by supplanting their agreement with a tort action that claims that the party misperformed the agreement in question.

In sum, this Court finds that the Supreme Court of Pennsylvania would adopt the "gist of action" test to determine whether a cause of action can sound in tort or breach of contract. In addition, this Court finds, as it recently did in another case, that Pennsylvania no longer will attempt to distinguish a tort claim from a breach of contract claim on the basis that plaintiff alleges misfeasance or improper performance of a service contract. *See New Chemic (U.S.), Inc. v. Fine Grinding Corp.,* 948 F.Supp. 17, 20 (E.D.Pa.1996) (Kelly, R., J.).

■ Applying the gist of the action test here, the Court finds that plaintiff's claim sounds more properly in breach of contract, then it does in negligence. Plaintiff's negligence claim merely alleges that Blum was an agent of Schuller and that repairs done by Blum pursuant to the Guarantee and/or the Settlement Agreement were done negligently. Because of Blum's negligent repairs, FMI alleges that the roofing system was not made watertight as required by the Guarantees that had been incorporated into the

Settlement Agreement; this failure by Schuller to make the roof water tight has allegedly damaged FMI.

An examination of Counts I and II of plaintiff's complaint indicates that it is this very same claim—that Schuller has failed to make the roofing system watertight—that forms the basis of plaintiff's breach of contract counts. This obligation or duty to keep the roof watertight was only imposed on Schuller through the Guarantees. Without these Guarantees, Schuller would not have been obligated to make the roofing system watertight, and thus, FMI simply would not have a claim. It is obvious to this Court that the "gist" of this claim is a breach of Settlement Agreement and/or Guarantee, sounding only in breach of contract, not in tort. Therefore, the Court dismisses Count III of plaintiff's complaint.[5]

■ Although not explicitly raised by the defendant, the Court also finds that plaintiff cannot assert their tort claim sounding in fraud. This Court finds that the allegations set forth in plaintiff's fraud count, and reiterated in its brief, are simply another way of stating its claim for breach of contract. *See Public Service Co. of N.H. v. Westinghouse Elec. Co.,* 685 F.Supp. 1281, 1290 (D.N.H. 1988). Indeed, a close review of plaintiff's fraud count demonstrates that the gist of this count, as well as the action, is that defendant breached its obligations under the Guarantees. Thus, the Court does not find that the Guarantees are merely collateral to the wrong ascribed to Schuller under FMI's fraud count.

Instead, the Court finds that the obligations arising out of the Settlement Agreement and/or Guarantees are central to plaintiff's fraud count. In its fraud count, FMI notes that Schuller had an obligation under the Settlement Agreement "to pay for and supervise repairs sufficient to render the roofing system of the building watertight." (Compl.¶ 59). FMI further states that this obligation to make the roofing system water-

tight arose under the Guarantees. In its fraud count, FMI claims that Schuller knew at the time that it signed the Settlement Agreement that only the replacement of the entire roofing system would make the entire roofing system watertight. Thus, FMI essentially argues Schuller committed fraud by failing to disclose the fact that its proposal would never make the roof watertight. As stated in its brief, this non-disclosure of a material fact is the equivalent of the affirmation of a falsity, *i.e.,* a misrepresentation.

Based on these allegations, it is clear that FMI's fraud claim is merely another way of stating its breach of contract claims. The breach of contract claims center around the argument that Schuller breached the contracts by failing to repair the roofing system to ensure that FMI had a watertight roof. FMI's contention to make the roof watertight, through repairs if necessary, arises directly out of the contract dispute. FMI's claim that Schuller misrepresented the fact that its repairs would make the roof watertight are so intertwined with the obligations that flow from the Guarantees, the Court cannot find that the Guarantees are collateral to plaintiff's fraud count. Thus, the Court concludes that plaintiff's fraud claim more properly sounds in contract than tort; thus, Count IV of plaintiff's complaint is dismissed.[6]

## B. The Economic Loss Doctrine

■ Schuller also argues that plaintiff's negligence claim is barred by the economic-loss doctrine. In general, the economic-loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995). "The rationale of the economic loss rule is that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Palco Linings, Inc. v. Pavex, Inc.,* 755 F.Supp. 1269,

---

**5.** Because the Court grants summary judgment in defendant's favor on Count III of plaintiff's complaint, the Court will not address whether the negligence claim is barred by the statute of limitations.

**6.** Because the Court has dismissed plaintiff's fraud count, the Court will not address defendant's other arguments which seek dismissal of plaintiff's fraud count.

1271 (M.D.Pa.1990). Compensation for losses suffered as a result of a breached agreement "requires an analysis of damages which were in the contemplation of the parties at the origination of the agreement, an analysis within the sole purview of contract law." *Auger v. Stouffer Corp.,* No. CIV.A.93–2529, 1993 WL 364622, at *3 (E.D.Pa.Aug. 31, 1993). "In order to recover negligence, 'there must be a showing of harm above and beyond disappointed expectations evolving solely from a prior agreement. A buyer, contractor, or subcontractor's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.'" *Sun Co. v. Badger Design & Constructors, Inc.,* 939 F.Supp. 365, 371 (E.D.Pa.1996).

In *Hartford Fire Ins. Co. v. Huls America, Inc.,* 893 F.Supp. 465 (E.D.Pa.1995), Judge Pollak considered a case very similar to the one presently before this Court. In that case, the roof of a building owned by Alpha Housing and Health Care, Inc., an insured of Hartford, failed. Hartford reimbursed Alpha for its losses and then subsequently sued the manufacturer of the roof and the architecture firm, which had been hired to inspect the building and report anticipated problems, to recoup its losses. Hartford sued the roof manufacturer in both negligence and strict liability for resulting water damage and interruption of Alpha's business.

■ Applying the economic-loss doctrine, Judge Pollak found that plaintiff's tort claims (strict liability and negligence) for damages to the roof and relating to water damage to the building and to the resulting interruption of Alpha's business were precluded. In the *Hartford* case, Hartford argued that the water-damage and business interruption claims were not precluded because they represent damage to "other property"-that is, property other than the roof itself. In rejecting this argument, Judge Pollak stated that "when

faced with the question, the Pennsylvania Supreme Court will conclude that, at least within the commercial context, the phrase 'other property' does not include the type of property that one would reasonably expect to be injured as a direct consequence of the failure of the product at issue." *Id.* at 469. This Court agrees.

In support of his conclusion, Judge Pollak cited to the decision of *N.Y. State Electric & Gas Corp. v. Westinghouse Elec. Co.,* 387 Pa.Super. 537, 564 A.2d 919, 925–26 (1989), in which the Superior Court insightfully explained the reasoning for the holding in *East River:*

> [W]here an allegedly defective product causes damage only to itself, and other consequential damages resulting from the loss of the use of the product, the law of contract is the proper arena for redressing the harm because in such a case the damages alleged relate specifically to product quality and value as to which the parties have had the opportunity to negotiate and contract in advance. They have allocated the risk of possible types of losses, and agreed on the level of quality that will be given for the price demanded. When the product fails to conform and only economic losses result, the parties' recovery one against the other for economic losses should be limited to an action on that contract an no additional recovery in negligence or strict liability is permitted.

*Id.* at 469 (citing *Westinghouse,* 564 A.2d at 925–26).[7] As noted by Judge Pollak, this reasoning essentially supports the position that the "economic-loss doctrine precludes recovery in tort for claims that seek to recover damages for failed commercial expectations . . . ." *Id.* at 470.

■ In this case, the Court finds that the economic-loss doctrine precludes recovery on plaintiff's negligence because it seeks to re-

---

**7.** The Third Circuit, in *Aloe,* indicated that *East River* could be read as resting on five considerations:

> (1) when the defective product injures only itself the reasons for imposing a tort duty are weak and those limiting remedies to contract law are strong; (2) damage to the product itself is most naturally understood as a warranty claim; (3) contract law is well suited to

commercial controversies because the parties may set the terms of their own agreements; (4) warranty law sufficiently protects purchasers by allowing them to obtain the benefit of their bargain; and (5) warranty law has built-in limitation on liability, whereas tort actions could subject manufacturers to an indefinite amount of damages.

*Aloe Coal,* 816 F.2d at 118.

cover for failed commercial expectations. FMI expected to receive a watertight roof which would protect its building from water damage and allow it to continue to rent out the space in the building without interruption. In addition, FMI must have also expected that the watertight roof would protect its tenants' property from damage. The roof failed to do so. This clearly is a case of failed commercial expectations. Thus, FMI's recovery is in contract, not tort.

▓ FMI makes three arguments against why the economic-loss doctrine should not be applied in this case; the Court finds that they are all without merit. First, FMI incorrectly argues that the economic-loss doctrine does not apply to a claim for *negligence* based on a service contract. In *Sun Co.*, this court applied the economic-loss doctrine in a breach of services contract case. *Sun Co.*, 939 F.Supp. at 372 (citing many other cases which applied the economic-loss doctrine to the breach of a services contract). This Court agrees with Judge Padova's reasoning in *Sun Co.* and finds that the Pennsylvania Supreme Court, if presented with the issue, would not hesitate to rule that the economic-loss doctrine can be applied in a breach of services contract case.

The Court also rejects FMI's argument that *Hartford* is inapplicable to the facts of this case because there is a claim for water damages in the instant case. This argument is incredible in light of the fact that Judge Pollak found that Hartford's claim for water damage to the building did not qualify as "other property." The Court wonders whether FMI's counsel even read *Hartford.*

Finally, the Court finds that the economic-loss doctrine is applicable to this case even though FMI claims losses for water damage to property owned by the tenants. As explained above, the economic-loss doctrine precludes claims for property that one would reasonably expect to be injured as a direct consequence of the failure of the product at issue. In this case, FMI and Schuller must have both reasonably expected that if the roof was not watertight, *any* property in the building could be injured by leaks. This is just plain common sense. Thus, the Court finds that the phrase "other property" does not include property owned by the tenants.

Because the Court finds that FMI only claims economic losses under its negligence claim, the Court finds that the economic-loss doctrine precludes recovery. Thus, Count III of plaintiff's complaint is dismissed.[8]

### C. Breach of the Settlement Agreement

Schuller argues that this Court must enter judgment in its favor on Count I of plaintiff's complaint because FMI cannot demonstrate that there was a breach of the Settlement Agreement. Schuller contends that under the Settlement Agreement, it only agreed to do two things: (1) pay $12,000 for repairs to the "Damaged Roof" portion of the roof and (2) extend the expiration date of the existing Guarantee to three different portions of the roof. Schuller claims that it honored these two obligations. As such, Schuller contends that there cannot be a breach of the Settlement Agreement. Schuller states that the only potentially viable claim that FMI possess is breach of the Guarantees that may have occurred after the Settlement Agreement was signed.

In response, FMI argues that it has alleged a valid breach of the Settlement Agreement. To begin, FMI contends that the Settlement Agreement cannot be interpreted apart from two other crucial documents: the Guarantees and the proposal of May 23, 1992, which was incorporated as Exhibit A to the Settlement Agreement. FMI contends that the most important part of the Settlement Agreement was the transfer of the Guarantees into its name from the Budd Company and the extension of the expiration dates of the Guarantees on certain parts of the roof. FMI asserts that Schuller's continuing performance of its obligations under the Guarantees was a critical element of the Settlement Agreement. FMI claims that Schuller's failure to live up to its obligations under the Guarantees—by failing to provide FMI with

---

8. The Court also finds that Alternative Counts IV and VI, sounding in negligent design and strict liability, are precluded by the economic-loss doctrine. Thus, the Court also dismisses Alternative Counts IV and VI.

a watertight roof, and by failing to service the roof at all in 1996—constituted a breach of the Settlement Agreement.

In addition to this alleged breach, FMI claims that Schuller breached the Settlement Agreement when Blum's efforts to fix all roof defects failed. Attached to the Settlement Agreement was a proposal dated May 23, 1992, in which Blum stated that it would make certain repairs on both the lower and upper roof areas. FMI also contends that Mr. Blum testified at deposition that it was his intent, under the proposal, to fix all roof defects that he found, and that the purpose of the proposal was to stop all leaks. FMI contends that "[t]he failure of Blum's repair work to render the building watertight violated Schuller's obligation to repair the Damaged Roof of the Facility," and thus constituted a breach of the Settlement Agreement.

■ After carefully reviewing the Settlement Agreement, and considering the parties' respective positions, the Court finds that FMI cannot state a valid claim for breach of the Settlement Agreement. FMI cannot point to one provision of the Settlement Agreement which was breached. Under the Settlement Agreement, Schuller agreed to bear the costs of labor to repair the Damaged Roof of the Facility and to supply material necessary to do the work as outlined in the May 23, 1992 proposal. Indisputably, Schuller complied with these obligations.

Despite FMI's intimations to the contrary, nowhere in the Settlement Agreement did Schuller, in consideration of FMI's release of any claims that it may have had against Schuller, agree that the repairs of Blum would make the roof watertight. The Settlement Agreement only contemplated that Schuller would pay Blum to conduct the repairs. Of course, the parties probably hoped that the repairs would stop the leaking. However, there is simply no provision in the Settlement Agreement that would indicate that FMI released its claims against Schuller only in consideration for Schuller's promise that it would stop the leaking.

The question which arises at this point is: what did FMI get in consideration for releasing it claims against Schuller? Beyond Schuller's promise to pay for Blum's repairs,

FMI received the exact protection it was looking for in the future; Schuller transferred the Guarantees to FMI and also extended the expiration dates on the Guarantees for certain portions of the roof. Thus, if the repairs of Blum, as contemplated in the Settlement Agreement, did not work, FMI could request that Schuller repair the building to its watertight condition as required by the Guarantees. If Schuller did not conduct the repairs, then FMI could bring suit against Schuller for breach of the Guarantees, which it has done. Although the Court finds that in the Settlement Agreement, Schuller promised to transfer and extend the Guarantees, the Court does not find that Schuller promised to make the roof watertight as consideration for FMI's release. The Settlement Agreement clearly indicates that Schuller merely promised to transfer and extend these Guarantees, which it did. Although the Guarantees state that Schuller will make the roof watertight, nowhere is this promise to make the roof watertight set forth as a covenant, promise, or obligation in the Settlement Agreement. Simply put, Schuller's promise to make the roof watertight arises out of the Guarantees, not the Settlement Agreement. Thus, there can be no breach of the Settlement Agreement based on Schuller's failure to make the roof watertight. This failure only implicates Schuller's obligation to conduct repairs under the Guarantees. If Schuller fails to conduct these repairs, as FMI alleges here, then FMI will have a claim based on the Guarantees.

Holding the evidence in a light most favorable to FMI, this Court finds that FMI simply cannot prove a breach of the Settlement Agreement. Thus, the Court enters judgment in favor of defendant and against plaintiff on Count I of plaintiffs' complaint.

### D. Plaintiff's Alternative Causes of Action

In its complaint, plaintiff seeks to reinstate, as Alternative Causes of Action, its claims against Schuller which were originally asserted in *Factory Market Inc. v. Manville Sales Corporation.* FMI claims that it is entitled to reinstate these claims because

Schuller breached the Settlement Agreement. However, because the Court has concluded that FMI cannot prove that Schuller breached the Settlement Agreement, FMI cannot reinstate its claims against Schuller which were originally asserted in the state court action. Thus, the Court dismisses all of plaintiff's Alternative Causes of Action.[9]

### E. The Recovery of Consequential Damages

Schuller contends that the Court must strike plaintiff's claim for consequential damages because the Guarantees at issue preclude such recovery. All of the Guarantees at issue contain the following language:

> MANVILLE AND ITS AFFILIATES WILL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES TO THE BUILDING STRUCTURE (UPON WHICH THE ROOFING SYSTEM IS AFFIXED) OR ITS CONTENTS, LOSS OF TIME OR PROFITS OR ANY INCONVENIENCE. MANVILLE AND ITS AFFILIATES SHALL NOT BE LIABLE FOR ANY DAMAGES WHICH ARE BASED UPON NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY OTHER THAN THE EXCLUSIVE LIABILITY SET FORTH IN THIS GUARANTEE. INCIDENTAL AND CONSEQUENTIAL DAMAGES SHALL NOT BE RECOVERABLE EVEN IF THE REMEDIES OR THE ACTIONS PROVIDED FOR HEREIN FAIL OF THEIR PURPOSE.

Schuller claims that this language clearly precludes FMI from recovering any consequential damages, including loss of rents.

■ Although the general rule is that a contract provision eliminating liability for special, indirect or consequential damages is valid and enforceable, *see National Cash Register Co. v. Modern Transfer Co., Inc.,*

224 Pa.Super. 138, 302 A.2d 486, 491 (1973), other courts, albeit in the context of the U.C.C., have held that there are cases in which the court may find that such a limitation is not enforceable. *See, e.g., Otobai, Inc. v. Auto Tell Services, Inc.,* No. CIV.A.93–2855, 1994 WL 249766 (E.D.Pa. June 1, 1994). In this case, FMI argues, by analogy to the U.C.C., that the damages limitation in the Guarantees should not be enforced because the remedy of repair that is provided for in the Guarantees has failed of its essential purpose.

Although FMI may be correct in its position that the repair remedy has failed of its essential purpose, the Court finds that whether a remedy failed of its essential purpose may be irrelevant for the purposes of determining whether a damages limitation will be enforced. In *Chatlos, Sys. Inc. v. National Cash Register Corp.,* 635 F.2d 1081 (3d Cir.1980), the Third Circuit addressed this same issue, albeit in the context of the U.C.C.[10] In *Chatlos,* the Third Circuit noted that while several cases have held that when a limited remedy fails of it purpose, an exclusion of consequential damages also fails, other cases have held that the issue of preclusion is a separate matter. *Id.* at 1086.

In resolving this matter, the Third Circuit predicted that the New Jersey Supreme Court would treat the consequential damage disclaimer as an independent provision, valid unless unconscionable. *Id.* The court continued by stating that "[a] contract may well contain no limitation on breach of warranty damages but specifically exclude consequential damages. Conversely, it is quite conceivable that some limitation might be placed on a breach of warranty award, but consequential damages would be expressly be permitted." *Id.* The court explained that "[t]he limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of

---

9. Because the Court dismisses plaintiff's Alternative Causes of Action, the Court will not address whether plaintiff can assert Alternative Counts III and V, sounding in breach of implied warrantee.

10. This Court must also note that the Third Circuit was applying New Jersey law in this case. This distinction, however, is irrelevant because the provisions of the New Jersey Uniform Commercial Code which were at issue in *Chatlos* are identical to the provisions contained in Pennsylvania's version of the Commercial Code.

warranty ." *Id.* "The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable." *Id.*

This Court recognizes that the decision in *Chatlos* was made in the U.C.C. context, thus, a person could comfortably argue that its reasoning is not applicable here. Indeed, the standard of unconscionability is drawn directly from the language of the U.S.C. Likewise, the standard of failure of its essential purpose is drawn from the language of the Code. However, another person could plausibly argue that the underlying rationale of the *Chatlos* court can be applied in the non-U.C.C. context. In *Chatlos,* the Court noted that a contract may contain no limitation on damages, but contain a limitation on remedies, or the contract could contain no limitation on the remedies, but contain a limitation on damages. In essence, the Court's underlying reasoning—that the two methods of limiting recovery are distinct and discrete—still applies in the non-U.C.C. context. Thus, if these two limitations are distinct, then it would not be illogical to apply two separate standards to determine whether the limitation should be enforced.

Thus, the threshold question which is posited at this point in time is what standard should the Court apply to determine whether a contractual provision limiting damages should be enforced. Only after resolving this question can the Court properly decide whether it should enforce the consequential damages exclusion in this case. However, because the parties have not fully briefed the issue as to what standard should be applied, the Court will not attempt to resolve this important issue at this time.

### F. Punitive Damages

 Under Pennsylvania law, "punitive damages are not recoverable in a breach of contract action." *eds Adjusters, Inc. v. Computer Sciences Corp.,* 818 F.Supp. 120, 122 (E.D.Pa.1993). FMI claims that it is entitled to recover punitive damages under its fraud and negligence claims. The Court, however, has dismissed plaintiff's fraud and negligence claims. Thus, the Court must also strike FMI's claim for punitive damages.

### IV. Conclusion

Accordingly, for the foregoing reasons, defendant's motion for partial summary judgment is granted in part and denied in part. Defendant's motion is granted to the extent that it seeks dismissal of Counts I, III, and IV and all of the Alternative Causes of Action in plaintiff's complaint. In addition, defendant's motion is granted to the extent that defendant seeks to strike plaintiff's claim for punitive damages. Defendant's motion is denied in all other respects.