229 P.3d 906 (2010)
POULSBO GROUP, LLC, Appellant,
v.
TALON DEVELOPMENT, LLC, Respondent.
No. 38984-3-II.
Court of Appeals of Washington, Division 2.
March 30, 2010.
*907 Bryan Christopher Graff, Ryan Swanson & Cleveland PLLC, Seattle, WA, for Appellant.
David P. Horton, Law Office of David P. Horton Inc. PS, Silverdale, WA, for Respondent.
VAN DEREN, C.J.
¶ 1 Poulsbo Group, LLC appeals the trial court's order granting summary judgment in favor of Talon Development, LLC on Poulsbo Group's claims stemming from Poulsbo Group's agreement to purchase a subdivision plat from Talon. Poulsbo Group sued Talon for (1) intentional misrepresentation; (2) breach of contract; and (3) breach of the implied duty of good faith and fair dealing. The trial court granted summary judgment in favor of Talon on all of Poulsbo Group's claims and denied Poulsbo Group's cross motion for partial summary judgment against Talon on its breach of contract claim. We affirm the trial court's dismissal of Poulsbo Group's intentional misrepresentation claim based on the economic loss rule. We reverse the trial court's rulings dismissing Poulsbo Group's claims for breach of contract and the implied duty of good faith and fair dealing and its denial of Poulsbo Group's cross motion for summary judgment on its breach of contract claim and remand for further proceedings, including damages related to the breach of contract claim on which Poulsbo Group prevails.

FACTS
¶ 2 In 2006, Talon began subdivision work on a plat named Talon Glen in Poulsbo, Washington. At this same time, Snowberry Enterprises, LLC, was developing a neighboring plat. Part of Snowberry's development work included the construction of a number of water, sewer, and street improvements.
¶ 3 In August 2006, Talon and Snowberry communicated on several occasions about the possibility of sharing the costs of Snowberry's development improvements that could benefit Talon's property. Talon representatives exchanged e-mails and telephone calls with Holly White, a Snowberry project representative. Don Babineau, an engineer with C.E.S. NW Inc., who Talon hired, sent the following e-mail to White:
What we would like to do is to have Olsen design the sewer and water stubs and have [Snowberry's] contractor install them so that we do not have to tear up the road once it is built. We also will need the main water connection point designed and installed. This connection point is located adjacent to the lot line between lots 17 and 18. The sewer stubs are for lots 7 through 11 and 14 and 15. The water stubs are for lots 7 & 8, 9 & 10, 11 & 14, and 15 & 16. Our client, Talon Development, will pay for the design and installation of the water main connection and the water and sewer stubs.
*908 Clerk's Papers (CP) at 280. Talon sent another e-mail to Snowberry, which stated:
I heard from CES (our design engineers) that your contractor is ready to install water and sewer lines. I understand that CES is designing the locations of connection points for these utilities to access some of the planned lots on our Talon Glen development.
Can your contractor give us a cost estimate to make those connections with stubs out from under the road. [sic] (I'm assuming this would be water and sewer). We would prefer to delay payment of any main line cost sharing until we actual[l]y develop the parcel.
CP at 281. And C.E.S. engineers sent an e-mail to White soon thereafter:
It [is] my understanding that your engineer is backed up and may not be able to make the changes. I am willing to have CES NW Inc. make the changes to the approved plans. However, I am not sure the city will accept revised plans from CES. In my opinion the best way is to handle this through a change order process. The changes in my opinion are rather minor. There are 7 sanitary service stubs at 50' long. In addition there are 10 water services that are needed. Please see the attached map (in PDF format) for specifics. I think the engineering work could be completed in 3-4 hours. I am sure my client will be in contact with you to discuss the cost associated with the engineering and construction of these improvements.
CP at 282. Despite these exchanges, Talon and Snowberry failed to reach an agreement to share costs, and Snowberry moved forward with the utility improvements.
¶ 4 On January 19, 2007, Talon and Poulsbo Group entered into a vacant land purchase and sale agreement (Agreement) for the future Talon Glen development. An optional clauses addendum required Talon to disclose all documents related to Talon Glen within three days.[1] And a feasibility contingency addendum gave Poulsbo Group 90 days to verify the suitability of the Talon Glen property for Poulsbo Group's intended purpose.[2] Talon also signed a seller disclosure statement, in which it answered "no" to two questions: "Are there any encroachments, unrecorded boundary agreements, boundary disputes or claims by neighbors pertaining to the Property?" and "Are there any pending or existing assessments against the Property?" CP at 273.
¶ 5 Also on January 19, the city of Poulsbo (City) held a hearing on Talon's request for *909 preliminary plat approval of Talon Glen. Tom Smith, a Talon member, and Craig Deaver, an engineer on the project, both attended the hearing. White also attended on Snowberry's behalf. No one from Poulsbo Group attended. White testified that Snowberry wanted a condition added to the Talon Glen plat approval, requiring that Talon Glen participate in a latecomer agreement,[3] regardless of whether the City could process the agreement before construction. The hearing examiner did not make the latecomer agreement a condition of preliminary plat approval, but he advised White to submit a latecomer agreement to the City so the City could facilitate enforcement. On February 23, Snowberry submitted a latecomer agreement application to the City.
¶ 6 Talon did not provide the e-mails or other documents related to Talon's discussions with Snowberry during the 90 days provided in the feasibility contingency period. Talon also told John Jack, a Poulsbo Group member, on multiple occasions that there would not be a latecomer assessment. In addition, several City documents relating to the Talon Group project stated that no late-comer agreements existed on the project. But the hearing examiner's plat approval decision, issued February 1, specifically referred to White's testimony about Snowberry's desire for a latecomer agreement. Jack apparently did not review the plat approval documents or the hearing examiner's decision during the feasibility period; instead, he relied on oral statements from Talon representatives that stated there would be no latecomer agreement assessment.
¶ 7 Poulsbo Group's purchase of Talon Glen closed on March 30. Poulsbo Group learned about the latecomer agreement assessment after closing. The City approved the latecomer agreement in October and the City assessed Poulsbo Group $85,849.19.
¶ 8 Poulsbo Group sued Talon for breach of contract, breach of the implied duty of good faith and fair dealing, and intentional misrepresentation. Talon successfully moved for summary judgment; and Poulsbo Group unsuccessfully sought a cross motion for partial summary judgment on its breach of contract claim.
¶ 9 Poulsbo Group appeals.

ANALYSIS

I. Standard of Review
¶ 10 We review summary judgment orders de novo. Qwest Corp. v. City of Bellevue, 161 Wash.2d 353, 358, 166 P.3d 667 (2007). A trial court properly grants summary judgment when no genuine issues of material fact exist, thereby entitling the moving party to a judgment as a matter of law. CR 56(c). We draw all reasonable inferences from the facts in the light most favorable to the nonmoving party. Hisle v. Todd Pac. Shipyards Corp., 151 Wash.2d 853, 860-61, 93 P.3d 108 (2004). And questions of fact may be determined on summary judgment as a matter of law only where reasonable minds could reach but one conclusion. Alexander v. County of Walla Walla, 84 Wash.App. 687, 692, 929 P.2d 1182 (1997).

II. Intentional MisrepresentationEconomic Loss Rule
¶ 11 Poulsbo Group contends that the trial court erred in granting Talon's motion for summary judgment on its intentional misrepresentation claim. We disagree.
¶ 12 In order to prevail on a claim for intentional misrepresentation, Poulsbo Group must show: "(1) representation of an existing fact, (2) materiality, (3) falsity, (4) the speaker's knowledge of its falsity, (5) intent of the speaker that it should be acted upon by the plaintiff, (6) plaintiff's ignorance of its falsity, (7) plaintiff's reliance on the truth of the representation, (8) plaintiff's right to rely upon the representation, and (9) damages suffered by the plaintiff." W. Coast, Inc. v. Snohomish County, 112 Wash.App. 200, 206, *910 48 P.3d 997 (2002). Each element must be established by "`clear, cogent and convincing evidence.'" Stiley v. Block, 130 Wash.2d 486, 505, 925 P.2d 194 (1996) (quoting Sigman v. Stevens-Norton, Inc., 70 Wash.2d 915, 920, 425 P.2d 891 (1967)).
¶ 13 Talon asserts that the economic loss rule bars Poulsbo Group's claim for intentional misrepresentation. The economic loss rule serves to limit parties to their contract remedies when a loss potentially implicates both tort and contract relief. Alejandre v. Bull, 159 Wash.2d 674, 681, 153 P.3d 864 (2007). The rule "`prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract'" because "`tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.'" Alejandre, 159 Wash.2d at 681-82, 153 P.3d 864 (internal quotations omitted) (quoting Factory Mkt., Inc. v. Schuller Int'l, Inc., 987 F.Supp. 387, 395 (E.D.Pa.1997)). Division One of this court held in Carlile v. Harbour Homes, Inc., 147 Wash.App. 193, 194 P.3d 280 (2008), review granted in part by, 166 Wash.2d 1015, 210 P.3d 1019 (2009) that the economic loss rule, as pronounced in Alejandre, bars claims for intentional misrepresentation. Carlile, 147 Wash.App. at 205-07, 194 P.3d 280.
¶ 14 Poulsbo Group, however, asks us to hold, contrary to Carlile, that the economic loss rule does not bar intentional misrepresentation claims stemming from a contract dispute. Poulsbo Group cites Jackowski v. Borchelt, 151 Wash.App. 1, 209 P.3d 514 (2009), review granted, 168 Wash.2d 1001, 226 P.3d 780 (2010) and Stieneke v. Russi, 145 Wash.App. 544, 190 P.3d 60 (2008), review denied, 165 Wash.2d 1026, 203 P.3d 381 (2009) to support this. But Jackowski and Stieneke did not consider whether intentional misrepresentation claims fall under the economic loss rule and are therefore not dispositive. The overarching rule in Alejandre guides us here: Parties should be limited to contract remedies when a loss potentially implicates contract and tort relief. 159 Wash.2d at 681, 153 P.3d 864. Thus, the economic loss rule bars Poulsbo Group's intentional misrepresentation claim because contract remedies exist.
¶ 15 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: HUNT and QUINN-BRINTNALL, JJ.
NOTES
[1] The specific provision provided:

Within 3 days after mutual agreement of the purchase and sale agreement the seller will provide to buyer all related documents of said property. This includes but is not limited to:
1. Soil reports
2. Environmental Studies
3. Alta Survey
4. Traffic Study
5. All meeting notes and memorandums relating to the property.
6. Al Engineering documents
CP at 341.
[2] The feasibility contingency provision in the Agreement itself provided:

It is the Buyer's responsibility to verify before [the expiration of 90 days] whether or not the Property can be platted, developed and/or built on (now or in the future) and what it will cost to do this. BUYER SHOULD NOT RELY ON ANY ORAL STATEMENTS concerning this made by the Seller, Listing Agent, or Selling Licensee. Buyer should inquire at the city or county, and water, sewer or other special districts in which the Property is located. Buyer's inquiry should include, but not be limited to: building or development moratoriums applicable to or being considered for the Property; any special building requirements, including setbacks, height limits or restrictions on where buildings may be constructed on the Property; whether the property is affected by a flood zone, wetlands, shorelands or other environmentally sensitive area; road, school, fire and any other growth mitigation or impact fees that must be paid; the procedure and length of time necessary to obtain plat approval and/or a building permit; sufficient water, sewer and utility and any service connection charges; and all other charges that must be paid.
CP at 337.
A provision in the optional clauses addendum also gave Poulsbo Group 5 days after the delivery of final plat approval to terminate the agreement:
Seller to provide plat approval before the expiration of feasibility study. If final plat approval is not complete the feasibility time period shall extend to a period of 5 days after final plat approval is delivered to purchaser. If plat approval is subjectively unsatisfactory to purchaser, then purchaser has the option to terminate this agreement.
CP at 341.
[3] Latecomer agreements allow property owners that have installed street or utility improvements to recover a portion of the costs of those improvements from other property owners who later develop property in the vicinity and use the improvements, as provided for in chapter 35.72 RCW (streets) and chapter 35.92 RCW (utilities). See Municipal Research and Services Center of Washington, Latecomers Agreements, http:// www.mrsc.org/ subjects/pubworks/latecomers.aspx (last updated November 2009) (last visited March 17, 2010).