

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-15-2002

# Werwinski v. Ford Mtr Co

Precedential or Non-Precedential:

Docket No. 00-4323

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Werwinski v. Ford Mtr Co" (2002). *2002 Decisions.* Paper 276.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/276

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 15, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-4323

ROBERT N. WERWINSKI, JR.; ELIZABETH C.
WERWINSKI; JEAN C. COOK; DONNA COFFEY; JOSEPH
COFFEY; JOAN MCILHENNY; DORIS E. ZAHARCHUK;
JAMES DUNLAP, on behalf of themselves and all others
similarly situated

v.

FORD MOTOR COMPANY,

Jean C. Cook, Donna Coffey, Joseph Coffey, Joan
McIlhenny, Doris E. Zaharchuk and James Dunlap, on
behalf of themselves and all others similarly situated,

Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 00-cv-00943)
District Judge: Honorable Ronald L. Buckwalter

Argued January 15, 2002

BEFORE: SCIRICA, GREENBERG, and
BRIGHT,* Circuit Judges

(Filed: April 15, 2002)

_____
* The Honorable Myron H. Bright, Senior Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.


Joseph C. Kohn
Martin J. D'Urso (argued)
David J. Cohen
Diana Liberto
Hilary Cohen
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107

Attorneys for Appellants

Lynn E. Parseghian
Brian C. Anderson
Martha Dye
Srikanth Srinivasan (argued)
O'Melveny & Myers, LLP
555 13th Street, N.W.
Suite 500 West

Washington, DC 20004

Robert Toland, II
Campbell, Campbell, Edwards &
 Conroy
Three Glenhardie Corporate Center
1265 Drummers Lane
Suite 200
Wayne, PA 19087

  Attorneys for Appellee

2

Hugh F. Young, Jr.
Product Liability Advisory
 Council, Inc.
1850 Centennial Park Drive,
 Suite 510
Reston, VA 22091

Christopher Scott D'Angelo
Janelle E. Fulton
Montgomery, McCracken, Walker
 & Rhoads
123 South Broad Street
Philadelphia, PA 19109

  Attorneys for Amicus Curiae
Product Liability Council, Inc.

OPINION OF THE COURT

GREENBERG, Circuit Judge:

This appeal arises out of a putative class action against
Ford Motor Company relating to two allegedly defective
components in the transmissions installed in Ford vehicles
during the 1990-1995 model years. Asserting that Ford
knew about the defective parts since at least 1991,
appellants sued for breach of express warranty, breach of
implied warranty, fraudulent concealment, and violations of
Pennsylvania's Unfair Trade Practices and Consumer
Protection Law ("UTPCPL"), Pa. Stat. Ann. tit. 73, SS 201-1
et seq. (West 1993). The district court, after denying
appellants' motion to remand the case to the state court in
which they had originated it, granted Ford's motion for
judgment on the pleadings as to all of appellants' claims.
For the reasons set forth below, we will affirm the district
court's orders.

I. BACKGROUND

A. Factual History

Eight plaintiffs who bought or leased Ford automobiles
manufactured between 1991 and 1995, six of whom appeal,

3

filed the complaint in this case alleging that the transmissions in their vehicles contained two defective parts: (1) aluminum (rather than steel) forward clutch pistons ("FCPs") that crack prematurely, and (2) inadequately lubricated planetary gears ("RPGs"). Appellants assert that both defects can cause transmission failures, including "sudden acceleration, delayed forward or reverse engagement, sudden shifts into reverse, and a total loss of acceleration or forward movement." Br. of Appellants at 5. According to the complaint, each of the appellants experienced transmission failure and incurred substantial repair costs before his or her automobile had reached 80,000 miles.[1]

Appellants assert that Ford's Technical Service Bulletins demonstrate that the company has known about the FCP defects since at least 1991. They maintain that Ford redesigned the FCPs twice before finally deciding in 1994 to manufacture them with steel instead of aluminum. Appellants similarly allege that Ford has been aware of the RPGs' lubrication defect since at least 1990. Even after redesigning the RPGs in 1990 and 1992, however, Ford has been unable to correct the lubrication problem. Despite its awareness of these malfunctioning components, Ford never warned the overwhelming majority of car owners about the transmission defects. According to appellants, Ford not only concealed this material information from consumers as it continued to market and sell automobiles with defective transmissions, but it addressed the problem by cutting its 6-year/60,000 mile power train warranty for its 1991 models to a 3-year/36,000 mile warranty for its 1992 models.

---

1. Jean Cook's 1991 Mercury Sable experienced transmission failure at 44,500 miles; Donna and Joseph Coffey's 1995 Ford Winstar experienced transmission problems at 50,000 miles; Joan McIlhenny's 1990 Ford Taurus had to have its transmission overhauled at 73,159 miles; Daria Zaharchuk's 1993 Ford Taurus experienced transmission failure at 48,779 miles; and James Dunlap's 1995 Ford Winstar had to have its transmission overhauled at 65,000 miles. See Pls.' Compl. PP 33-37 (App. 43a-45a).

4

B. Procedural History

On January 20, 2000, appellants filed their putative class action in the Philadelphia County Court of Common Pleas. Ford promptly removed the case to the district court on the basis of diversity of citizenship following which appellants moved to remand the case, arguing that the amount-in-controversy jurisdictional threshold exceeding $75,000 had not been satisfied. On April 11, 2000, the district court denied appellants' motion for remand and thus retained jurisdiction over the case. In its order, the district court first indicated that Pennsylvania courts "have found that

the amount in controversy in a suit under the UTPCPL is the purchase price of the car." Werwinski v. Ford Motor Co., No. Civ. A. 00-943, 2000 WL 375260, at *3 (E.D. Pa. Apr. 11, 2000). Finding that a jury reasonably could conclude that appellants were entitled to recover the purchase price of their automobiles to make them whole, the court started with a base of $15,000 in damages. See id. After trebling the compensatory damages to $45,000 pursuant to the UTPCPL, the court next determined that reasonable attorney's fees could range between $5,000 and $10,000, thus pushing the amount to over $50,000. See id.  Finally, recognizing that the UTPCPL provides courts with discretionary authority to impose punitive damages, the district court concluded that "[b]ased on Plaintiffs' allegations, a reasonable jury could award punitive damages that would easily place the amount in controversy above $75,000." Id. at *4.2

On May 24, 2000, Ford filed a motion for judgment on the pleadings. After the motion was briefed fully, the district court entered an order granting the motion with respect to the claims of all parties except the Werwinskis' claim for breach of express warranty. Of concern on this appeal, the district court dismissed the fraudulent concealment and UTPCPL claims under the economic loss doctrine because "recovery in tort is barred in product

_____

2. Having concluded that the compensatory and punitive damages could exceed the amount-in-controversy threshold, the court deemed it unnecessary to consider the value of the injunctive relief sought by appellants. See id.

5

liability actions between commercial enterprises where the only damage alleged is to the product itself, even if the defect posed a potential risk of injury." Werwinski v. Ford Motor Co., No. Civ. A. 00-943, 2000 WL 1201576, at *4 (E.D. Pa. Aug. 15, 2000). In coming to this conclusion, the district court determined that the economic loss doctrine is not limited to transactions between commercial enterprises, but extends to transactions between manufacturers and individual consumers as well. See id. at *5. Furthermore, the district court predicted that the Supreme Court of Pennsylvania would conclude that the economic loss doctrine applies to claims for intentional fraud in addition to claims for negligence, strict liability, and negligent misrepresentation. See id. Finally, the district court observed that Pennsylvania's two-year statute of limitations for common law fraud actions barred the fraud claims of several appellants. See id. at *6 n.5.

Eventually, the Werwinskis settled their case with Ford and dismissed all of their claims with prejudice. 3 On December 12, 2000, the district court entered final judgment for Ford. Three days later, appellants filed a timely notice of appeal challenging both the district court's order denying remand and its order disposing of the case

on the merits.

II. JURISDICTION AND STANDARD OF REVIEW

A. Jurisdiction

The district court exercised removal jurisdiction over this putative class action based upon diversity of the parties. See 28 U.S.C. SS 1332(a)(1), 1441(b). The district court entered final judgment in the case on December 12, 2000, and appellants filed a timely notice of appeal, and thus we have appellate jurisdiction pursuant to 28 U.S.C.S 1291.

B. Standard of Review

We exercise plenary review over the district court's order

_____

3. Consequently, the Werwinskis are not parties to this appeal, even though their names remain in the caption as a procedural formality. See Br. of Appellants at 4 n.2.

6

denying appellants' motion for remand, see Lazorko v. Pa. Hosp., 237 F.3d 242, 247 (3d Cir. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 2552 (2001), and its order granting Ford's motion for judgment on the pleadings, see Churchill v. Star Enters., 183 F.3d 184, 189 (3d Cir. 1999).

III. DISCUSSION

Appellants raise several issues on appeal. First, they contend that the district court erred in denying their motion to remand because the amount-in-controversy requirement for diversity jurisdiction had not been met for any of their claims. Second, they argue that the district court erroneously applied the economic loss doctrine to their fraudulent concealment and UTPCPL claims. Finally, appellants submit that the district court erred in ruling that the Pennsylvania statute of limitations barred certain of their fraudulent concealment claims. See infra note 9.

A. Amount in Controversy

A district court has subject matter jurisdiction over state law claims if there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 for each plaintiff. See 28 U.S.C.S 1332. Appellants argue that the district court should not have exercised removal jurisdiction because the $75,000 threshold has not been satisfied. In particular, they contend that the court erred when calculating the amounts in controversy by taking into account the purchase price of their vehicles, rather than just the repair costs for their transmissions.

A district court's determination as to the amount in controversy must be based on the "plaintiff 's complaint at the time the petition for removal was filed." Steel Valley

Auth. v. Union Switch Div., 809 F.2d 1006, 1010 (3d Cir. 1987). The court must measure the amount "not . .. by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." Angus v. Shiley Inc., 989 F.2d 142, 146 (3d Cir. 1993). However, "claims of several plaintiffs, if they are separate and distinct, cannot be aggregated for purposes of determining the amount in controversy." Meritcare Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 218 (3d Cir. 1999) (internal

quotation marks omitted). See also Zahn v. Int'l Paper Co., 414 U.S. 291, 301, 94 S. Ct. 505, 512 (1973). Only claims, whether related or unrelated, of a single plaintiff against a single defendant may be aggregated. See Snyder v. Harris, 394 U.S. 332, 335, 89 S. Ct. 1053, 1056 (1960). 4

Appellants first argue that the amount in controversy for each plaintiff does not even approach $75,000 because their complaint requests compensatory damages for only the costs of repairing or replacing the defective transmissions, which range from $848 to $2,434. See Br. of Appellants at 12. Appellants' erroneous assertion that their complaint does not claim damages based on the purchase price of the automobiles is belied, however, by their complaint's "Prayer for Relief," which plainly seeks recovery for, inter alia, "compensatory damages" and "all or part of the sums [appellants] paid to purchase or lease [their] automobiles." Pls.' Compl. at 19-20 (App. 54a-55a). The "Prayer for Relief " also demands "that defendant disgorge, for the benefit of the class, its ill-gotten profits received from the sale or lease of the subject vehicles and/or make full restitution to the Named Plaintiffs and the other members of the Class." Id. at 20 (App. 55a). Although appellants indicated in their motion to remand that they were seeking only repair costs and that "individual claims

---

4. Appellants allege in their complaint that their claims exceed $50,000 in value, see Pls.' Compl. P 42 (App. 46a), but they insist that they included this allegation to avoid the case being referred to Pennsylvania's mandatory arbitration program. See Br. of Appellants at 12. The district court considered this allegation to be a concession by appellants that the amount in controversy was at least $50,000 and that they were seeking more than merely $2,000-$3,000 in repair costs for each plaintiff. See Werwinski, 2000 WL 375260, at *3. Appellants explain that they reached the $50,000 figure by aggregating their damages, which they assert is allowed to pass the state mandatory arbitration threshold but is not permitted to pass the federal amount in controversy threshold. See Br. of Appellants at 12. The district court rejected appellants' explanation, concluding for itself that the local rules governing the mandatory arbitration program do not permit aggregation. See Werwinski, 2000 WL 375260, at *3. We need not resolve this issue, however, for even if the district court was correct, appellants' alleged admission that the amount in controversy exceeded $50,000 would not in itself satisfy the $75,000 threshold.

for compensatory damages[ ] will rarely exceed $2,000, and will not exceed $3,000," Pls.' Mot. for RemandP 3 (App. 112a), the amount in controversy must be calculated based on a "reasonable reading" of the complaint, and a plaintiff 's stipulation subsequent to removal as to the amount in controversy or the types of relief sought is of"no legal significance" to the court's determination. See Angus, 989 F.2d at 145. Consequently, the district court properly found that the complaint did not restrict appellants' recovery to only the cost of repairing the defective transmissions, and therefore, a jury reasonably could conclude that appellants should be awarded the purchase price of their cars to make them whole.

Appellants assert that the district court based its holding on a "jaundiced reading" of their complaint because the only injuries pled or specific sums listed in the complaint relate to the repair and replacement costs of the defective transmission parts. See Reply Br. of Appellants at 6. They note that the complaint makes no reference to the value of their automobiles or how much they paid for them. See id. at 7. Appellants insist that the district court's reading of the complaint essentially requires them to state explicitly that they were seeking only repair costs and were not seeking refunds for the purchase price of the automobiles. See id. at 8. They submit that requiring them to plead with "such redundancy" violates Fed. R. Civ. P. 8(a). Id.

If the "Prayer for Relief " in their complaint did not request an order declaring Ford "financially responsible . . . for all or part of the sums [appellants] paid to purchase or lease [their] automobiles" or demand that Ford disgorge "its ill-gotten profits received from the sale or lease of the subject vehicles," then we might say that appellants' argument has some merit. Nevertheless, because of these provisions, the complaint clearly leaves the door open for them later to demand reimbursement for the purchase price of the cars. And because the district court must base its amount-in-controversy determination on what a jury reasonably could award appellants, it cannot be said that the court erred in concluding on the basis of the complaint

9

that a jury could decide that appellants are entitled to refunds for the purchase price of their cars.5

Appellants next contend that the district court's amount-in-controversy calculation was flawed inasmuch as litigants are not permitted to recover the purchase price of their vehicles under the UTPCPL. Appellants argue that the four cases6 cited by the district court to support its conclusion that the purchase price of a vehicle is recoverable under the UTPCPL are inapposite because the courts in those cases calculated the amount in controversy under Pennsylvania's "Lemon Law," Pa. Stat. Ann. tit. 73, SS 1951-63 (West 1993), not the UTPCPL. The Lemon Law provides, in

relevant part, that:

> If the manufacturer fails to repair or correct a
> nonconformity after a reasonable number of attempts,
> the manufacturer shall, at the option of the purchaser,
> replace the motor vehicle with a comparable motor
> vehicle of equal value or accept return of the vehicle
> from the purchaser and refund to the purchaser the
> full purchase price, including all collateral charges, less
> a reasonable allowance for the purchaser's use of the
> vehicle . . . .

---

5. Appellants assert that the district court used the purchase price of the vehicles instead of the repair costs even after acknowledging that the parties agreed the complaint sought reimbursement for the cost of transmission repair. See Br. of Appellants at 13. Appellants misrepresent the district court's statement, however, for the court simply observed that "[t]he parties seem to agree that the Complaint could be read as asking for the cost of repairing the damage[d] transmissions." Werwinski, 2000 WL 375260, at *2 (emphasis added). The district court went on to explain that Ford nevertheless argued that additional costs pushed the amount above $75,000. See id. Despite the impression appellants are trying to leave with this court through their characterization of the district court's ruling, the parties never agreed that the repair costs (not the purchase price) were the appropriate starting point for assessing the amount in controversy.

6. These four cases are: Pavese v. General Motors Corp., No. Civ. A. 97-3688, 1998 WL 57761 (E.D. Pa. Feb. 11, 1998); Palan v. Ford Motor Co., Civ. A. No. 95-1445, 1995 WL 476240 (E.D. Pa. Aug. 8, 1995); Voorhees v. General Motors Corp., Civ. A. No. 90-295, 1990 WL 29650 (E.D. Pa. Mar. 16, 1990); Adams v. General Motors Corp. , Civ. A. No. 89-7653, 1990 WL 19950 (E.D. Pa. Feb. 26, 1990).

10

Id. at 1955 (emphasis added). Appellants submit that the UTPCPL, unlike the Lemon Law, does not specify that compensatory damages should be based on the purchase price of the vehicle and, therefore, the measure of damages in this case should be based on the cost of repairing or replacing the defective parts.

Appellants' argument fails for two reasons. First, although the UTPCPL does not specifically identify the vehicle's purchase price as the appropriate measure for compensatory damages, it likewise does not indicate that repair costs should be the sole measure for damages. The UTPCPL provides instead that a plaintiff can recover "actual damages," which the court may treble at its discretion, as well as "such additional relief [the court] deems necessary or proper." Pa. Stat. Ann. tit. 73, S 201-9.2. Therefore, notwithstanding appellants' position to the contrary, the UTPCPL does not preclude a jury from awarding them damages based on the purchase price of their vehicles.

Second, appellants' argument is based on flawed interpretations of the opinions that the district court cited

in support of its conclusion that a vehicle's purchase price is the correct measure of compensatory damages under the UTPCPL. Despite what appellants argue in their briefs, the plaintiffs in Palan v. Ford Motor Co., Civ. A. No. 95-1445, 1995 WL 476240 (E.D. Pa. Aug. 8, 1995), Adams v. General Motors Corp., Civ. A. No. 89-7653, 1990 WL 19950 (E.D. Pa. Feb. 26, 1990), and Pavese v. General Motors Corp., No. Civ. A. 97-3688, 1998 WL 57761 (E.D. Pa. Feb. 11, 1998), specifically sought recovery under the UTPCPL, and the courts calculated the amount in controversy under the UTPCPL, notwithstanding the fact that the plaintiffs also stated claims under the Lemon Law.

For instance, the district court in Palan explicitly stated that "as to plaintiff 's Consumer Protection Law claim, the actual amount in controversy is three times the purchase price." See Palan, 1995 WL 476240, at *2. Furthermore, the district court in Adams concluded that, even leaving aside the Lemon Law claim, the UTPCPL claim itself exceeded the amount-in-controversy threshold insofar as the statute permitted the court to treble plaintiff 's base request of $22,027.84 in damages, which represented the purchase

11

price of the automobile. See Adams, 1990 WL 18850, at *2. Finally, the district court in Pavese had no choice but to calculate the amount in controversy under the UTPCPL after it held that the plaintiff failed to state a claim under the Lemon Law because she was leasing the vehicle and lessees are not permitted to sue under the Lemon Law. See Pavese, 1998 WL 577761, at *2-3. General Motors argued that the plaintiff 's actual damages under the UTPCPL could not exceed the total lease payments she had made at the time she filed her complaint ($16,637.48), whereas the plaintiff asserted that she was entitled to recover the full purchase price of the car ($33,505). The district court sidestepped the issue, however, by concluding that the amount-in-controversy threshold could be met by trebling the amount of plaintiff 's total lease payments ($16,637.48).7

Palan, Adams, and Pavese are consistent with two other decisions from the Eastern District of Pennsylvania recognizing a vehicle's purchase price as the appropriate measure of damages for automobile defect claims under the UTPCPL. In Levin v. American Honda Motor Co., Civ. A. No. 94-5380, 1994 WL 719856, at *3 (E.D. Pa. Dec. 21, 1994), the plaintiff sued under, inter alia, the Lemon Law and the UTPCPL, but the district court calculated the amount in controversy under the UTPCPL after dismissing the Lemon Law claim for failure to exhaust alternative remedies under the statute. In retaining jurisdiction over the case, the court concluded that "[t]he actual damages in this case would be the total purchase price less a reasonable allowance for the use of the vehicle." Id.

_____

7. Appellants are correct that one of the four opinions cited by the district court does not squarely support its holding. In Voorhees v.

General Motors Corp., Civ. A. No. 90 295, 1990 WL 29650, at *2 (E.D. Pa. Mar. 16, 1990), the district court first explained that the "actual damages for violation of the Lemon Law will be the total purchase price of the truck," and it then trebled the damages under the UTPCPL because a violation of the Lemon Law is also a violation of the UTPCPL. Thus, by intertwining the Lemon Law and the UTPCPL in its analysis of the amount in controversy, the court skirted the question of whether actual damages under the UTPCPL should be measured by the purchase price of the car.

In McLaughlin v. Volkswagen of America, Inc., No. Civ. A. 00-3295, 2000 WL 1793071, at *1 (E.D. Pa. Dec. 6, 2000), the plaintiff sued Volkswagen for fraud and fraudulent misrepresentation, negligent misrepresentation, breach of contract, and violations of the UTPCPL, alleging that her car contained a defective fuel level sensor. The district court determined that the baseline for damages under the UTPCPL was the car's purchase price ($50,000), not its reduction in value. See id. at *2. The court explained:

> Where an alleged defect relates to a discreet [sic], modular, or incidental part of the vehicle (such as the tires, windshield wipers or stereo), it is unreasonable to use the purchase price as a baseline for measuring the amount in controversy. In such cases, the better measure of damages is the replacement cost of the part in question. However, where an alleged defect relates to an integrated system that is necessary to the safe operation of the vehicle (such as the engine or transmission), it is reasonable to assume that the baseline for damages is the purchase price of the car.

Id. at *3.

Unable to reconcile their position with these authorities, appellants urge us to follow Waggoner Equipment Co. v. Ford Motor Co., No. 00-CV-0168-MJR (S.D. Ill. Nov. 6, 2000), and Jorgenson v. Ford Motor Co., No. CV-99-355 CAS (Ex), Minute Order (C.D. Ca. Mar. 30, 1999). Although these cases are factually similar in that the district courts remanded similar suits against Ford seeking recovery for the same faulty transmissions involved here, these two decisions from outside this circuit are unavailing for two reasons. First, the courts based their decisions on different state consumer protection statutes, so they provide little insight on whether a court should use the vehicle's purchase price as the baseline for determining the amount in controversy in a suit involving a Pennsylvania UTPCPL claim. Second, the cases are readily distinguishable on critical facts. For example, the plaintiff's complaint in Waggoner expressly stated that the amount sought by each plaintiff did not exceed $75,000. Thus, instead of arguing that the amount in controversy should be based on compensatory damages, Ford urged the court to consider

the cost of a provision in the complaint requiring the company to "create from scratch a massive owner identification, notification and transmission repair program," which Ford insisted would exceed $75,000. Similarly, in Jorgenson, Ford did not assert that compensatory and punitive damages for each plaintiff would exceed $75,000, but instead argued that the plaintiffs' claims for injunctive relief met the amount-in-controversy requirement. In both cases, the district courts concluded that the equitable relief sought did not satisfy the jurisdictional threshold and, therefore, remanded the cases.

Appellants do not provide a convincing argument to support their assertion that damages under the UTPCPL necessarily should be confined to the cost of repairing or replacing the defective transmissions and should not take into account the purchase price of the automobiles. Moreover, their complaint specifically seeks "all or part of the sums [appellants] paid to purchase or lease [their] automobiles." Pls.' Compl. at 19-20 (App. 54a-55a). Furthermore, the text of the UTPCPL allowing plaintiffs to recover "actual damages" for violations of the statute in no way precludes recovery for the purchase price of the vehicles. We also point out that appellants misconstrue three of the four cases cited by the district court, for these decisions plainly calculated the amount in controversy under the UTPCPL by using the purchase price of the vehicle, not the repair costs, as the baseline for damages. Finally, the only cases appellants present in support of their position are based on statutes from other states and easily are distinguished on critical facts. Overall, we are satisfied that the district court correctly held that the $75,000 threshold was exceeded for each of the appellants' claims. Therefore, we will affirm the district court's order denying appellants' motion for remand.

B. Economic Loss Doctrine

Appellants contend that the district court erred in applying the economic loss doctrine to their fraudulent concealment and UTPCPL claims because (1) the doctrine applies only to transactions between commercial entities, not to transactions involving individual consumers, and (2)

14

the doctrine does not bar actions for intentional fraud. The Supreme Court of Pennsylvania has not addressed either question, and inasmuch as Pennsylvania substantive law is controlling here, we must predict how the court would rule by "giving 'proper regard' to the relevant rulings of other courts of the state." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990). "In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." Gares v. Willingboro Twp., 90 F.3d 720, 725 (3d Cir. 1996). See

also U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996) ("The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise.").

The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995). The Supreme Court adopted the doctrine in an admiralty products liability case, holding that"a manufacturer in a commercial context has no duty under either negligence or strict-liability theory to prevent a product from injuring itself." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S.Ct. 2295, 2302 (1986). Though it recognized the need for products liability law to protect consumers from dangerous products, the Court expressed concern that if products liability remedies "were to progress too far, contract law would drown in a sea of tort." Id. at 866, 106 S.Ct. at 2300.

Drawing a distinction between tort and contract law, the Court observed that the need for a remedy in tort is reduced when the only injury is to the product itself and "the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' " Id. at 872, 106 S.Ct. at 2302. The Court explained that in such a situation express and implied warranties under contract law are best suited to compensate for a loss in product value. Not only would allowing an action to lie in tort impose substantial costs on

15

society, but relying on contract law permits parties to negotiate the terms of the manufacturer's liability. See id. at 872-73, 106 S.Ct. at 2302-03. In exchange for allowing the manufacturer to restrict its liability, the purchaser can bargain for a lower price. Id. at 873, 106 S.Ct. at 2303. Accordingly, the Court saw "no reason to intrude into the parties' allocation of the risk." Id.

Although the Supreme Court of Pennsylvania has not ruled on the viability of the economic loss doctrine, an en banc panel of the Pennsylvania Superior Court adopted the doctrine largely as set forth in East River. In REM Coal Co. v. Clark Equipment Co., 563 A.2d 128, 134 (Pa. Super. Ct. 1989), the court held that "negligence and strict liability theories do not apply in an action between commercial enterprises involving a product that malfunctions where the only resulting damage is to the product itself." Following the Supreme Court's reasoning in East River, the court stated that "contract theories such as breach of warranty are specifically aimed at and perfectly suited to providing complete redress in cases involving . . . economic losses." Id. at 129. The court further explained that"such losses are based upon and flow from the purchaser's loss of the benefit of his bargain and his disappointed expectations as

to the product he purchased. Thus, the harm sought to be redressed is precisely that which a warranty action does redress." Id. The court concluded that limiting a plaintiff to contract remedies was necessary because "[t]o impose tort liability in addition would certainly erode the important distinctions between tort and contractual theories, including their differing objectives." Id. at 411.

1. Commercial Entities

Appellants contend that the district court's dismissal of their claims under the economic loss doctrine was improper because the doctrine applies only to transactions between commercial enterprises. Ford maintains that the district court's holding not only was correct, but was consistent with Pennsylvania state court decisions recognizing that the economic loss doctrine extends to transactions involving individual consumers.

Appellants first argue that the district court's holding is inconsistent with the seminal opinions on the economic

loss doctrine because these decisions specifically speak of transactions between commercial entities. See East River, 476 U.S. at 871, 106 S.Ct. at 2302 ("manufacturer in a commercial relationship"); Duquesne Light, 66 F.3d at 620 ("sophisticated business entities"); REM Coal, 563 A.2d at 134 ("commercial enterprises"); Indus. Unif. Rental Co., Inc. v. Int'l Harvester Co., 463 A.2d 1085, 1093 (Pa. Super. Ct. 1983) ("commercial enterprises"). Appellants' argument is unavailing, however, for although the courts in these cases limited their discussions to the circumstances presented therein -- namely to transactions that happened to arise between two businesses -- these opinions do not indicate that the doctrine should not be applied to transactions involving noncommercial entities. Moreover, appellants do not offer authority specifically holding that the economic loss doctrine should not apply to transactions between manufacturers and noncommercial consumers.

In light of the Supreme Court of Pennsylvania's silence on the issue, the district court relied on the Pennsylvania Superior Court's decision in Jones v. General Motors Corp., 631 A.2d 665 (Pa. Super. Ct. 1993), to predict how the Supreme Court of Pennsylvania would resolve the matter. As in this case, the plaintiffs in Jones were individual consumers suing an automobile manufacturer for defective components in their vehicle, which in Jones caused a fire that destroyed their truck. See id. at 665. The superior court applied the economic loss doctrine to the plaintiffs' strict liability claim, holding that "we find that the rationale behind REM Coal is equally applicable to disputes involving claims brought by individuals." Id. at 666. The court explained that "[r]egardless of whether a consumer is a commercial entity or an individual, a manufacturer's warranty as to the quality of its product is a bargained for condition of sale, the effect of which must not be

undermined." Id.

Appellants urge us to disregard Jones because "it was a panel decision that cannot, by law, overrule the 'commercial entity' requirement of REM Coal , an en banc decision." Br. of Appellants at 22 (citing Larthey v. Bland, 532 A.2d 456, 459 (Pa. Super. Ct. 1987)). The superior court's decision in Jones, however, did not"overrule" REM

17

Coal in any manner: as explained above, the REM Coal court addressed the legal issue in the context of the facts of that particular case and never explicitly stated that the doctrine should not be applied to disputes between manufacturers and noncommercial parties. Even more importantly, appellants misinterpret REM Coal  as including a "commercial entity" requirement, for the court specifically reserved on whether the doctrine applies only to commercial enterprises. See REM Coal, 563 A.2d at 134 n.4 ("Since the case sub judice involves a dispute between commercial enterprises, as did East River and Aloe Coal, we need not and do not decide any questions regarding disputes between non-commercial parties.").

Appellants' position that we should ignore Jones  is at odds with our responsibility to give "significant weight" to state appellate court decisions that may provide insight into how the state supreme court would settle the issue. U.S. Underwriters, 80 F.3d at 93. Moreover, as Ford points out, Jones is not the only Pennsylvania decision applying the economic loss doctrine to commercial and noncommercial purchasers alike. See, e.g., Fasig v. Security-Conn. Life Ins. Co., 41 Pa. D. & C. 4th 494, 502-03 (Ct. Com. Pl. of Wayne County 1999); Buck v. Ford Motor Co., No. AR 97-6895, Pittsburgh Legal J., March 1999, at 83 (Ct. Com. Pl. of Allegheny County, Pa. Oct. 14, 1998). Therefore, even if courts rarely have cited Jones since it was issued eight years ago, the decision is still more predictive of how the Supreme Court of Pennsylvania would rule than the lack of cases presented by appellants in support of their position. Accordingly, as it was required to do, the district court correctly gave "proper regard" to Jones  in predicting that the Supreme Court of Pennsylvania would hold that the economic loss doctrine extends to individual consumers.

Appellants also criticize Jones as being"inconsistent with the purpose and rationale of the doctrine." Br. of Appellants at 22-23. They argue that East River and REM Coal applied the doctrine to contractual relationships between commercial entities because the sophisticated business enterprises in those cases not only understood the risks involved in negotiating the terms of the manufacturer's liability, but also possessed comparable bargaining power

18

that enabled them to enter into fair, arms-length

agreements. See id. at 17-18. Appellants insist that the underlying conditions present in East River and REM Coal do not exist in transactions between ordinary consumers and large corporations. See id. at 18. They explain that in commercial relationships between consumers and car manufacturers, the consumers lack bargaining power and are effectively powerless in negotiating the terms of a car's warranty. See id. Thus, to the extent that appellants were unable to enter into "informed, arms-length negotiations" with Ford over the terms of their warranties, appellants contend that the district court should not have applied the economic loss doctrine to their fraud and statutory claims.

Although car purchasers -- whether ordinary consumers or businesses -- may be unable to negotiate the specific details of their automobile warranties, or may be able to select among only limited options, purchasers certainly do not lack bargaining power. Purchasers have the freedom to chose a less expensive car with a limited warranty or a more expensive car with a longer-term warranty, and they often have the option of buying an extended warranty. Moreover, purchasers may select among cars of various manufacturers and consider the differences in warranties in making their choice. Indeed, manufacturers may and do advertise the advantage of their own warranties. And as the Supreme Court stated in East River, "[w]hile giving recognition to the manufacturer's bargain, warranty law sufficiently protects the purchaser by allowing it to obtain the benefit of its bargain. The expectation damages available in warranty for purely economic loss give a plaintiff the full benefit of its bargain by compensating for foregone business opportunities." East River , 476 U.S. at 873, 106 S.Ct. at 2303 (internal citation omitted).

Furthermore, appellants' proposal to differentiate between ordinary consumers and commercial entities would prove to be difficult to apply in practice. First, as alluded to above, businesses purchasing automobiles -- or any mass-produced product, for that matter -- may have no greater ability to negotiate the specific terms of a warranty than ordinary consumers. Second, a plaintiff 's sophistication cannot be assumed simply because it is a business or

19

corporation as distinguished from an individual consumer. Finally, if courts seek to avoid such baseless assumptions by engaging in case-by-case, fact-intensive inquires to determine the plaintiff 's level of sophistication, they will be drawn into the type of "difficult line-drawing process that can only yield inconsistent results." REM Coal, 563 A.2d at 132-33.

At bottom, not only do Pennsylvania state court decisions indicate that the Supreme Court of Pennsylvania likely would apply the economic loss doctrine to transactions involving ordinary consumers, but drawing a distinction between commercial and noncommercial plaintiffs would be entirely impracticable. Therefore, we conclude that the

district court properly held that the doctrine applies to transactions between manufacturers and ordinary consumers.

2. Intentional Fraud Exception

Appellants next challenge the district court's order on the grounds that it improperly applied the economic loss doctrine to their fraudulent concealment and UTPCPL claims, as they contend that pertinent Pennsylvania state court decisions and federal district court opinions interpreting Pennsylvania law do not support its holding. Ford argues, however, that the district court, after reviewing persuasive case law from other jurisdictions, correctly predicted that the Supreme Court of Pennsylvania would resist creating an exception for intentional fraud actions.

Before examining decisions from other jurisdictions addressing whether the economic loss doctrine bars claims of intentional fraud, the district court first found a split in authority among Pennsylvania federal district courts on the issue. Appellants maintain, however, that there is no such split arguing that the three decisions arising out of the Eastern District of Pennsylvania that the court cited in support of its finding are distinguishable. Appellants explain that Factory Market, Inc. v. Schumer International, Inc., 987 F. Supp. 387, 395, 397 (E.D. Pa. 1997), and Sun Co., Inc. v. Badger Design & Constructors, Inc., 939 F. Supp. 365, 370, 374 (E.D. Pa. 1996), involved negligent

20

misrepresentation claims, not intentional fraud claims. In addition, they argue that the passage in Sneberger v. BTI Americas, Inc., No. Civ. A. 98-932, 1998 WL 826992, at *8 (E.D. Pa. Nov. 30, 1998), stating that fraud and negligent misrepresentation actions are barred by the economic loss doctrine was dicta supported by only one case, Eagle Traffic Control v. Addco, 882 F. Supp. 417 (E.D. Pa. 1995), which itself was a negligent misrepresentation case.

Appellants contend that, inasmuch as there is not a split in authority among district courts interpreting Pennsylvania law, the district court erred in relying on authority from other jurisdictions in predicting how the Supreme Court of Pennsylvania would decide the issue. Appellants submit that the district court should have followed the holdings of the other federal district courts in Pennsylvania to have addressed the specific issue raised in this case-- namely, whether claims for intentional fraud, as distinguished from negligent misrepresentation, are barred by the economic loss doctrine. See Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc., 85 F. Supp. 2d 519, 535 (W.D. Pa. 2000); KNK Med.-Dental Specialities, Ltd. V. Tamex Corp. , Nos. Civ. A. 99-3409, Civ. A. 99-5265, 2000 WL 1470665, at *5 (E.D. Pa. Sept. 28, 2000); Polymer Dynamics, Inc. v. Bayer Corp., No. Civ. A. 99-4040, 2000 WL 1146622, at *7 n.5 (E.D. Pa. Aug. 14, 2000); Montgomery County v. Microvote Corp., No.

Civ. A. 97-6331, 2000 WL 134708, at *7 (E.D. Pa. Feb. 3, 2000); N. Am. Roofing & Sheet Metal Co., Inc. v. Bldg. & Constr. Trades Council of Phila. & Vicinity, AFL-CIO , No. Civ. A. 99-2050, 2000 WL 230214, at *7 (E.D. Pa. Feb. 29, 2000); Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 658 (W.D. Pa. 1999); Auger v. Stouffer Corp., No. 93-2529, 1993 WL 364622, at *5 (E.D. Pa. Aug. 31, 1993); Palco Linings, Inc. v. Pavex, Inc., 755 F. Supp. 1269, 1271 (M.D. Pa. 1990).

In the face of appellants' string of district court decisions, Ford first notes that the district court opinions are not binding on this court, for we must give only Pennsylvania state court decisions "proper regard." Ford then goes on to argue that all of these cases are unavailing because they can be traced back to Palco Linings, 755 F. Supp. at 1271, which is not based on a Pennsylvania state court decision,

but on the Illinois Supreme Court opinion in Moorman Manufacturing Co. v. National Tank Co., 435 N.E.2d 443 (Ill. 1982). See Peerless Wall, 85 F. Supp. 2d at 535; KNK Med., 2000 WL 1470665, at *5; Polymer Dynamics, 2000 WL 1146622, at *7 n.5; Montgomery County, 2000 WL 134708, at *7; N. Am. Roofing, 2000 WL 230214, at *7; Sunquest, 40 F. Supp. 2d at 658; Auger, 1993 WL 364622, at *5.

Ford also points out that the district courts in KNK Medical, Polymer Dynamics, and Montgomery County -- like the district court in this case -- explicitly recognized that there was a split in authority on the issue. Moreover, as Ford asserts, the three decisions lend questionable support to appellants' argument in favor of an intentional fraud exception. For instance, KNK Medical is unavailing because the court permitted the fraud claim only after concluding that it was "sufficiently distinct from [the] contract claims." KNK Med., 2000 WL 1470665, at *6. Polymer Dynamics is not controlling because the court explicitly declined to resolve the question after noting that the defendant did not raise the doctrine as a defense. See Polymer Dynamics, 2000 WL 1146622, at *7 n.5. Finally, Montgomery County is unreliable because the court emphatically stated that "the economic loss doctrine bars the County's recovery for both negligent and intentional misrepresentation," but then inexplicably reversed course and permitted the plaintiff 's intentional misrepresentation claim, perhaps out of an abundance of caution in light of the apparent split in authority. Montgomery County, 2000 WL 134708, at *7.

We are satisfied from our review of the case law Ford and appellants cite that the law in Pennsylvania with respect to the application of the economic loss doctrine to intentional fraud actions remains unsettled, and the district court opinions interpreting Pennsylvania law on the point provide little guidance. As already noted, the Supreme Court of Pennsylvania and the other Pennsylvania appellate courts have not resolved the issue in a published opinion. The Pennsylvania federal district court cases appellants and

Ford cite are of limited help, for not only is there an apparent split among them, but these opinions address the issue in a very conclusory fashion without providing any explanation why the Supreme Court of Pennsylvania would

22

rule in a particular way. Moreover, as Ford points out, these district court prognostications do not control our prediction of how the Supreme Court of Pennsylvania would settle the issue.

Having determined that the federal and state decisions interpreting Pennsylvania law shed little light on the question at issue, we next look outside the jurisdiction for persuasive authority on the subject. See Hughes v. Long, 242 F.3d 121, 128 (3d Cir. 2001) ("In predicting how a matter would be decided under state law we examine: (1) what the Pennsylvania Supreme Court has said in related areas; (2) the decisional law of the Pennsylvania intermediate courts; (3) federal appeals and district court cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issues we face here.").

We start with the three opinions interpreting Florida, Wisconsin, and Minnesota law that the district court cited in its order. See Hoseline, Inc. v. U.S.A. Diversified Prods., Inc., 40 F.3d 1198, 1200 (11th Cir. 1998); Cooper Power Sys., Inc. v. Union Carbide Chem. & Plastics Co., Inc., 123 F.3d 675, 682 (7th Cir. 1997); Nelson Distrib., Inc. v. Stewart-Warner Indus. Balancers, a Div. of Stewart-Warner Corp., 808 F. Supp. 684, 688 (D. Minn. 1992). Appellants assert that these opinions are irrelevant, insisting that we should disregard them because they "bear no relation to this consumer fraud action." Br. of Appellants at 26 n.9. Aside from referring to the opinions as "out-of-court decisions," however, appellants fail to explain why the opinions are inapposite. Instead, they simply comment that the opinions underscore their argument that we already have rejected that the economic loss doctrine is limited to disputes between commercial enterprises. Notwithstanding appellants' position, these opinions squarely support the district court's holding, as they undeniably recognize that the economic loss doctrine bars tort recovery for intentional fraud claims. Nevertheless, we find that the opinions are short on explanation and therefore provide little insight into how the Supreme Court of Pennsylvania might resolve the matter.

Appellants urge us to adopt the position appellants advance because it represents the majority rule. In a

23

footnote in their reply brief, they cite 23 cases from other federal and state jurisdictions recognizing some type of fraud exception to the economic loss doctrine. See Br. of Appellants at 10-12 n.6. After reviewing the opinions cited

in both parties' briefs and conducting our own independent research, we find most persuasive the well-developed federal and state case law interpreting Michigan and Wisconsin law regarding the economic loss doctrine. We particularly are influenced by an emerging trend in these and other jurisdictions "recogniz[ing] a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent[ly] of the underlying contract." Raytheon Co. v. McGraw-Edison Co., Inc., 979 F. Supp. 858, 870 (E.D. Wis. 1997).

The leading case is Huron Tool & Engineering Co. v. Precision Consulting Services, Inc., 532 N.W.2d 541, 545 (Mich. Ct. App. 1995), in which a Michigan state appellate court recognized an exception for fraud-in-the-inducement claims, but only if the fraud is "extraneous to the contract," not "interwoven with the breach of contract." The court acknowledged that "[f]raud in the inducement presents a special situation where parties to a contract negotiate freely --which normally would constitute grounds for invoking the economic loss doctrine--but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." Id. The court limited the exception for fraud-in-the-inducement claims, however, stating that "where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." Id. Accordingly, the court held that the "plaintiff may pursue a claim for fraud in the inducement extraneous to the alleged breach of contract." Id. at 546.

Huron's impact extends beyond Michigan. The Court of Appeals for the Seventh Circuit relied on Huron when it determined that there was no basis for treating an intentional misrepresentation claim differently from a negligent misrepresentation claim under Wisconsin law. See Cooper Power, 123 F.3d at 682. Explaining that the plaintiff

24

was free to extract an express warranty from the manufacturer to remedy any misrepresentation, whether intentional or innocent, the court reasoned that intentional "[m]isrepresentations . . . that ultimately concern the quality of the products sold[ ] are properly remedied through claims for breach of warranty." Id. The Huron limitation also influenced the Court of Appeals for the Eighth Circuit when it concluded that "[a] fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent misrepresentation." AKA Distrib. Co. v. Whirlpool Corp., 137 F.3d 1083, 1086 (8th Cir. 1998). Finally, the Florida Supreme Court explicitly embraced Huron 's distinction "between fraud extraneous to the contract and fraud interwoven with the breach of contract" when it held that "[w]here a contract exists, a tort action will lie for

either intentional or negligent acts considered to be independent from acts that breached the contract." HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1239-40 (Fla. 1996).

This approach is not without its critics, however, as at least one district court in the Eastern District of Wisconsin has challenged the Huron limitation on several grounds. See Budgetel Inns, Inc. v. Micros Sys., Inc., 8 F. Supp. 2d 1137 (E.D. Wis. 1998) (Budgetel I); Budgetel Inns, Inc. v. Micros Sys., Inc., 34 F. Supp. 2d 720 (E.D. Wis. 1999) (Budgetel II). That court presented three reasons to support its prediction that the Wisconsin Supreme Court would reject Huron and conclude that fraud-in-the-inducement claims as a rule are not barred by the economic loss doctrine. First, it surmised that the practical effect of the Huron limitation would be the complete elimination of the fraud-in-the-inducement exception because fraudulent inducement cases always involve misrepresentations concerning the quality or characteristics of the subject matter of the underlying contract. See Budgetel I, 8 F. Supp. at 1146. See also Black's Law Dictionary at 661 (6th ed. 1990) (defining "fraud in the inducement" as "[m]isrepresentation as to the terms, quality or other aspects of a contractual relation . . . that leads a person to agree to enter into the transaction with a false impression

25

or understanding of the risks, duties or obligations she has undertaken"). Second, the court stated that fraudulent inducement claims are, in reality, always independent of the contract insofar as the fraudulent inducement must occur before the formation of the contract. See Budgetel I, 8 F. Supp. 2d at 1147. Third, the court found that the Huron limitation conflicted with the underlying policies of the economic loss doctrine inasmuch as intentional misrepresentations impede parties from freely allocating economic risk between them. See id. at 1148.

Only eight months after the court decided Budgetel II, another district court in the Eastern District of Wisconsin upheld the Huron limitation and, in so doing, responded to each of the criticisms of Huron in the Budgetel opinions. See Rich Prod. Corp. v. Kemutec, Inc., 66 F. Supp. 2d 937, 977-80 (E.D. Wis. 1999). First, the court rejected the notion that the limitation rendered the fraud-in-the-inducement exception a nullity, maintaining that "[i]t is not difficult to conceive of several scenarios giving rise to claims for fraud in the inducement that survive a challenge under Huron." See id. at 979. The court explained:

> For example, a company might falsely misrepresent its financial condition, or the level of its insurance coverage, in order to induce another company to enter into a contract. Such considerations, while they may be relevant when considering who[m] to do business with, do not concern the underlying subject matter of the contract or a party's performance thereunder.

Another example is representations regarding organizational form and status. A company may represent itself as a non-profit, charitable organization in order to induce another company to do business on terms more favorable than would otherwise be the case. Or someone doing business as a corporation may represent themselves as a sole proprietorship or partnership, inducing another party to do business thinking they have recourse against personal assets should a dispute develop. Such representations have nothing to do with the subject matter of the underlying contracts or the offending party's performance thereunder, yet they may inflict damages upon the

26

party that relies on them when deciding whether or not to do business. The Huron limitation may set the bar high, but it is not the death knell of fraud in the inducement claims between contracting parties.

Id.

Second, the Rich Products court stated that if fraudulent inducement claims are exempted from the economic loss doctrine because, as Budgetel asserted, they always arise independently of a contract, then the economic loss doctrine would be rendered a nullity, and tort law would swallow contract law. The court explained that if"all claims for fraud in the inducement are extraneous or independent of the contract because they occur 'prior to the formation of the contract itself,' . . . every breach of warranty claim would be turned into a tort by a simple affidavit stating, in effect, that the warranty was spoken before it was written." Id. (internal citation omitted). The court also warned that "written disclaimers of warranties could be voided after the fact by the same affidavit, so long as the oral representations preceded the contract," thus causing chaos and uncertainty in commercial transactions. Id.

Third, the Rich Products court rejected the Budgetel court's concerns that the Huron limitation conflicts with the underlying purpose of the economic loss doctrine by allowing intentional misrepresentations to hamper the bargaining process and prevent the free allocation of economic risk by the parties. It explicated that"[w]arranties of merchantability and fitness for a particular purpose are common hedges against the carelessness or outright dishonesty of a party's representations regarding the subject matter of a contract." Id. at 980.

The district court in this case seems to have followed the Huron line of cases when it found "more persuasive the reasoning of courts that do bar fraud claims that are intertwined with contract claims and the resulting loss has been economic." Werwinski, 2000 WL 1201576, at *5 (emphasis added). Indeed, because appellants' fraudulent concealment claims relate to "the quality or character of the goods sold," the claims clearly are "intertwined" with, and

not "extraneous" to, their breach of warranty claims. Huron,

532 N.W.2d at 545. Appellants' fraud claims are "undergirded by factual allegations identical to those supporting their breach of contract counts." Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co., 722 F. Supp. 184, 201 (D.N.J. 1989). Moreover, the alleged fraudulent concealment "did not cause harm to the plaintiffs distinct from those caused by the breach of contract; and the mere fact that disclosure of certain facts to plaintiffs may have allowed them to take corrective action does not change the result." Id.

In addition to exploring persuasive authority from other jurisdictions, we also examine the justifications presented by the parties in support of their competing positions. Ford argues that appellants have failed to articulate any rationale for carving out an exception for intentional fraud actions when the alleged misrepresentation relates to the quality or properties of the subject matter of the underlying contract. See Br. of Appellee at 28. In particular, Ford submits that neither appellants nor any of the opinions they cite provide any justification for treating intentional fraud actions differently from negligent misrepresentation actions, which both parties agree the economic loss doctrine bars under Pennsylvania state case law. Ford explains that from the perspective of a buyer, "intentional (fraudulent) and innocent (negligent) misrepresentations have the same effect," and a buyer can insure against both types of harms through express warranties and statutory warranties. Id. at 30. As Ford opines, "just as the purchaser can protect itself in the contractual language against the other party's innocent, though wrong representations, so too can it protect itself -- by means of warranty -- against the other party's intentionally wrong representations about a product's performance or durability." Id. (internal citations and internal quotation marks omitted).

The essence of appellants' rationale for an intentional fraud exception is that applying the economic loss doctrine to such claims would not serve the doctrine's purpose of preventing tort law from reallocating risks between parties who fairly have negotiated an arms-length contract. First, appellants maintain that a transaction has not been

negotiated fairly -- and therefore does not allocate risk fairly -- if one party has made intentional false misrepresentations to the other. Second, appellants explain that "a party making an intentional misrepresentation is in a better position to assess the true risks associated with a contract and therefore should bear the risk of liability for a fraud claim." Amico v. Radius Communications, Inc., No. 1793, slip op. at 7 (C.P. Phila. Jan. 9, 2001) (attached as

Exhibit B to Reply Brief of Appellants). Finally, appellants submit that parties to a contract should not have to anticipate possible intentional misrepresentations by the other party when negotiating the allocation of risk between the parties:

> Although it makes sense to allow parties to allocate the risk of mistakes or accidents that lead to economic losses, it does not make sense to extend the [economic loss] doctrine to intentional acts taken by one party to subvert the purposes of the contract. Although theoretically parties could include contractual provisions discussing the allocation of responsibility when one party intentionally lies or misleads the other, it would not be conducive to amicable commercial relations to require parties to include such clauses in contracts. Expressing such a basic lack of trust in the other party would be likely to sour a deal from the start.
>
> A party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract. Public policy is better served by leaving the possibility of an intentional tort suit hanging over the head of a party considering outright fraud . . . .

First Republic Bank v. Brand, No. 147, slip op. at 13 (C.P. Phila. Dec. 19, 2000) (quoting Stoughton Trailers, Inc. v. Henkel Corp., 965 F. Supp. 1227, 1236 (W.D. Wis. 1997)) (attached as Exhibit C to Reply Brief of Appellants).

Both parties provide plausible explanations for their respective positions. On the one hand, appellants' policy justifications for creating an intentional fraud exception are somewhat persuasive, as it makes sense to provide parties

who have been victims of another party's intentionally fraudulent behavior special protections under tort law in order to deter such behavior. On the other hand, appellants are unable to explain why contract remedies are inadequate to provide redress when the alleged misrepresentation relates to the quality or characteristics of the goods sold. As Ford points out, the mental state of the wrongdoer is irrelevant from the buyer's perspective: a plaintiff suffers the same harm -- i.e., economic losses-- regardless of whether the misrepresentation is innocent, negligent, or intentional. Moreover, express warranties and state warranty statutes can provide for compensation to be awarded for these economic losses, regardless of whether the misrepresentation is innocent, negligent, or intentional. Thus, the need to provide a plaintiff additional tort remedies is diminished greatly when (1) the plaintiff can be made whole under contract law, and (2) allowing additional tort remedies will impose additional costs on society. As we have stated previously, "when loss of the benefit of a bargain is the plaintiff 's sole loss, . . . . the undesirable

consequences of affording a tort remedy in addition to a contract-based recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims." Duquesne Light , 66 F.3d at 618-19 (internal quotations omitted).

Furthermore, the district court based its prediction as to how the Supreme Court of Pennsylvania would resolve the issue on sound deductive reasoning. The district court applied the economic loss doctrine to the fraudulent concealment claims after recognizing the willingness of Pennsylvania courts to restrict intentional tort claims that overlap with contract claims. In particular, the district court cited the "gist of the action" doctrine 8 as evidence of

_____

8. As Phico Insurance Co. v. Presbyterian Medical Services Corp., 663 A.2d 753, 757 (Pa. Super. Ct. 1995), articulated, the "gist of the action" doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract. Appellants spend several pages of their opening brief challenging the district court's conclusion with respect to the "gist of the action" doctrine. Appellants misinterpret the district court's opinion, however, as relying on the "gist of the action" doctrine as an alternate basis for dismissing appellants' fraud claims. As Ford correctly points out, the district "court merely cited that rule by analogy as an indication of the Pennsylvania Supreme Court's likely leanings if presented with this issue in the context of the analogous economic loss doctrine." Br. of Appellee at 28-29 n.11.

the Pennsylvania courts' penchant for dismissing fraud claims that simply restate breach of contract claims. In the absence of any pertinent Pennsylvania case law on the subject, the district court aptly predicted that the Supreme Court of Pennsylvania would apply the economic loss doctrine to intentional fraud cases by drawing an analogy from Pennsylvania's acceptance of the "gist of the action" doctrine. Such a conclusion is congruent with our past recognition that Pennsylvania state courts have exhibited a "lack of hospitality to tort liability for purely economic loss." Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 119 (3d Cir. 1987). See also Pub. Serv. Enter. Group, Inc., 722 F. Supp. at 193 (recognizing "that Pennsylvania law is hostile to the recovery of economic losses in tort").

Finally, even if we were torn between two competing yet sensible interpretations of Pennsylvania law and did not find the district court's deductive reasoning to be persuasive, we should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of Pennsylvania decides differently. See City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 421 (3d Cir. 2002); Home Valu, Inc. v. Pep Boys, 213 F.3d 960, 965 (7th Cir. 2000) ("Where, as in this case, we are faced with two equally plausible interpretations of state law, we generally choose the narrower interpretation which restricts liability, rather than a more expansive interpretation which creates substantially more liability." (internal quotation

marks omitted)). The economic loss doctrine is designed to place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law. Carving out an exception for intentional fraud would eliminate that check on liability and blur the boundaries between the two areas of law, thus exposing manufacturers to substantially greater liability. In light of these realities, we select the path that limits liability by rejecting appellants' request for an intentional fraud exception.

Based on these reasons, we believe the district court correctly applied the economic loss doctrine to appellants' fraudulent concealment claims. Therefore, we will affirm the district court's order with respect to appellants' common law fraudulent concealment claims.

3. Statutory Fraud Claims

Appellants next argue that the district court erred in applying the economic loss doctrine to their fraud claims under the UTPCPL. Ford responds that the district court was correct when it ruled that there "does not seem to be an[y] reason for treating a common law fraudulent concealment claim differently from a statutory claim under a consumer protection statute." Werwinski, 2000 WL 1201576, at *5 (citing Weather Shield Mfg., Inc. v. PPG Indus., Inc., 1998 WL 469913, at *5 (W.D. Wis. June 11, 1998)).

Appellants attack the district court's conclusion by attempting to distinguish the case on which the district court relied. Appellants explain that the plaintiff in Weather Shield was a business that would be barred from bringing a claim under the Pennsylvania UTPCPL, which only applies to products purchased for "personal, family or household purposes." Pa. Stat. Ann. tit. 73,S 202-9.2(a). Appellants do not explain how this fact materially diminishes the persuasiveness of Weather Shield  on the issue of whether statutory fraud claims should be treated the same way as common law fraud claims under the economic loss doctrine.

Notwithstanding appellants' attempt to distinguish the case, Weather Shield provides persuasive authority for applying the economic loss doctrine to statutory misrepresentation claims. As the district court in Weather Shield explicates, "exempting [statutory fraud] claims from the effects of the economic loss doctrine would virtually nullify the doctrine since [the statute] is broad enough to encompass nearly every misrepresentation claim in the commercial sales context, and claims arising from product failure can readily be recast as misrepresentation claims." Weather Shield, 1998 WL 469913, at *6. Ford also offers in support of its position Flagg Energy Development Corp. v. General Motors Corp., 709 A.2d 1075, 1088 (Conn. 1998), in which the Connecticut Supreme Court held that the economic loss rule barred plaintiffs' claims under the

Connecticut Unfair Trade Practices Act because the claims "depend[ed] upon the allegations of fact that are identical to those asserted in their [contract] claims."

32

In light of the persuasive authority treating common law and statutory fraud claims similarly under the economic loss doctrine, and appellants' inability to proffer contrary authority, we do not believe that the district court erred in applying the doctrine to appellants' UTPCPL claims. Inasmuch as the same policy justifications for applying the doctrine to appellants' common law intentional fraud claims support the doctrine's application to appellants' UTPCPL claims, we will affirm the district court's order with respect to these statutory claims.9

IV. CONCLUSION

For the foregoing reasons, we will affirm the orders entered by the district court on April 11, 2000, and December 12, 2000.

9. In a footnote at the end of its decision, the district court concluded that the Pennsylvania two-year statute of limitations barred the Coffeys' and Daria Zaharchuk's common law fraud claims. See Werwinski, 2000 WL 1201576, at *6 n.5. The court decided that appellants' claims arose when they began experiencing problems with their transmissions, explaining that "a fraud claim arises when the plaintiff knew or should have known through the exercise of reasonable diligence of the injury stemming from the alleged fraud." Id. Accordingly, the court determined that the fraud claims of any plaintiffs who experienced transmission problems before January 21, 1998 (two years before the filing of the complaint) were time barred.

Appellants contend that the district court's ruling was erroneous because the discovery rule tolled the limitations period until they learned that a latent defect was causing their transmission problems. Appellants insist that when their cars failed, they did not know and had no reason to suspect that the transmission contained latent defects or that Ford knew about the defects and fraudulently concealed them from Ford automobile owners. Consequently, they argue that the statute of limitations did not begin to run on their fraudulent concealment claims until they discovered Ford's fraudulent behavior. Having determined that the economic loss doctrine bars the fraudulent concealment claims, we need not resolve this matter.

33

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

34